**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| MAGLULA, LTD.,<br><br>*Plaintiff,*<br><br>v.<br><br>AMAZON.COM, INC., and AMAZON.COM SERVICES, INC.,<br><br>*Defendants.* | Civil Action No. 1:19-cv-1570<br>Hon. Liam O'Grady |

## MEMORANDUM OPINION & ORDER

This matter comes before the Court on three motions by Defendants Amazon.com, Inc. and Amazon.com Services, Inc.: (1) Motion to Compel Arbitration and, as a Result, Dismiss or, in the Alternative, Stay this Action (Dkt. 23); (2) Motion to Transfer Venue to the Western District of Washington Pursuant to 28 U.S.C. § 1404(a) (Dkt. 26); and (3) Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) (Dkt. 20). Additionally, Defendants filed a Motion for Leave to File Sur-replies to the Motion to Compel Arbitration and the Motion to Transfer Venue (Dkt. 46), which the Court granted. The three substantive motions are fully briefed, and the Court heard oral argument on March 13, 2020. For the following reasons, the three pending motions are denied.

## I. BACKGROUND

Plaintiff Maglula, Ltd. ("Plaintiff" or "Maglula") brings this suit against Amazon.com, Inc. and Amazon Services, Inc. ("Defendants" or "Amazon") for trademark counterfeiting, trademark infringement, copyright infringement, and unfair competition under federal, state,

and/or common law. Maglula also asserts U.S. Patent No. 7,503,138 ("the '138 patent") and U.S. Patent No. 7,637,048 ("the '048 patent") (collectively, "the asserted patents") against Amazon for unauthorized offering to sell, selling, and/or importing of the accused products covered by at least one claim of each of the asserted patents.

Plaintiff is an Israeli corporation with a principal place of business in Israel. Maglula was founded in 2003, is privately held, and comprises ten people – while modest in size, it is a major player in the field of gun magazine loaders. Maglula supplies a variety of loading and unloading accessories for 9mm–45 caliber magazines to major retail chains like Bass Pro Shops and Dick's Sporting Goods, as well as independent brick and mortar stores, and online retailers. Compl. ¶¶ 13, 19, 20. Users include private individuals, police officers, federal agents, and military personnel. *Id.* ¶ 19.

Defendants are Delaware companies with their principal places of business in Seattle, Washington.[1] Amazon is reportedly the world's largest internet-based seller, with revenues in excess of $232 billion in 2018, and more than 500,000 employees. *Id.* ¶ 37. It sells products directly to its customers through www.amazon.com; these products include those that originate from Amazon, like Kindle and Alexa devices, as well as those from manufacturers, wholesalers, and third-party retailers. Some products are part of the secondary market, such as "Amazon Renewed," "Amazon Warehouse," and "Amazon Liquidations." *Id.* ¶¶ 39, 40, 42.

Maglula claims Amazon uses its online marketplace to offer for sale and/or sell counterfeit products that infringe Plaintiff's trademarks, copyrights, and asserted patents. These knock-off products are often marked as "sold by Amazon.com Services, Inc." or "sold by

[1] Since this lawsuit was filed, Defendant Amazon.com Services, Inc. converted to Amazon.com Services LLC. Like its predecessor, the new limited liability company is established in Delaware.

Amazon Warehouse and fulfilled by Amazon." *Id.* ¶¶ 46, 49. Similar indications and markings of Amazon fulfillment accompany orders through pallet liquidation sales. Additionally, among other complaints, some of the accused products bear "Made in China," where Plaintiff manufactures its genuine products in Israel. Maglula maintains that, although it established an Amazon Seller Account in December 2016, it never actually sold any of its products through that seller account. Rather, the only legitimate and authorized Maglula products sold through Amazon were via licensing agreements with third-party sellers.

Further, Plaintiff asserts that it exerted significant efforts to contact Defendants to stop the infringement, to no meaningful avail. Maglula contacted Defendants over the course of three years, through repeated requests and meetings with Amazon's in-house counsel, to report the infringement and seek remedial measures. These efforts included: many detailed letters, including cease and desist letters; informative memos educating Amazon and its agents on how to identify knock-offs, along with efforts to educate in-person; telephone conferences and emails regarding Amazon's continued sale of infringing products;[2] over one hundred infringement complaints through Amazon's official reporting channels; purchases of ten infringing products to illustrate the issues; active monitoring of Amazon, including hiring a third party at its own expense to identify and report infringement (BrandShield.com); and two lawsuits against Chinese entities selling knock-off products, believed to be in partnership with Amazon. *Id.* ¶ 7.

Ultimately, Plaintiff alleges Amazon has known for at least three years that these accused products were causing irreparable harm to Maglula and injury to the public, and thus acted knowingly, willfully, in reckless disregard of Maglula's rights, and in bad faith.

---

[2] Emails included over fifty to jeff@amazon.com and other officers detailing the infringement with images, documentation of Plaintiff's IP, names, links, and Amazon Standard Identification Numbers ("ASIN") to show Defendants exactly how to address the infringement.

The Court addresses each of Defendants' motions in turn.

## II. APPLICABLE LAW

### A. Motion to Compel Arbitration and, as a Result, Dismiss or Stay

While "the scope of an arbitration clause is essentially a question of contract interpretation, which is quintessentially a question decided by a court," there are circumstances where an arbitrator decides the threshold question of arbitrability. *Brenco Enterprises, Inc. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 611 (E.D. Va. 2018) (citing *Peabody Holding Co., LLC v. UMW*, 665 F.3d 96, 102 (4th Cir. 2012)). The threshold question is left to an arbitrator where the agreement "clearly and unmistakably provide[s] that the arbitrator shall determine what disputes the parties agreed to arbitrate." *Peabody*, 665 F.3d 96, 102 (quoting *Carson v. Food Giant, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999) (internal quotation and citation omitted)). The "clear and unmistakable" standard is exacting. *Peabody*, 665 F.3d 96, 102.

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A district court therefore has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002).

In this Circuit, "a litigant can compel arbitration under the FAA if he can demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure,

neglect or refusal of the defendant to arbitrate the dispute.'" *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)).

**B. Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)**

"Title 28, United States Code, Section 1404(a) provides that '[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.'" *Va. Innovation Scis., Inc. v. Samsung Elecs. Co., Ltd.*, 928 F. Supp. 2d 863, 867 (E.D. Va. 2013) (quoting 28 U.S.C. § 1404(a)). The district court has considerable discretion to consider transfer of venue on a case-by-case basis. *See Steward Org., Inc. v. Ricoh, Inc.*, 487 U.S. 22, 29 (1988) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)); *see also Cognitronics Imaging Sys., Inc. v. Recognition Research Inc.*, 83 F. Supp. 2d 689, 696 (E.D. Va. 2000) (recognizing the discretion the district court has to transfer to a more convenient forum).

The inquiry begins with jurisdiction, as "the transfer statute, 28 U.S.C. § 1404(a), allows transfer to a transferee district only if the case 'might have been brought' in that district." *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 357 F. Supp. 2d 924, 930 (E.D. Va. 2005). Once jurisdiction is established, the court proceeds to examine whether the interest of justice and the convenience of the parties justify transfer. *Koh v. Microtek Intern., Inc.*, 250 F. Supp. 2d 627, 630 (E.D. Va. 2003). Generally, the four factors to consider whether a transfer is warranted under § 1404 are: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of*

*the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015).

**C. Motion to Dismiss Under Rule 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. "Rule 8(a)'s relatively low notice-pleading[] muster" does not require detailed factual allegations, but it does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Smith v. Clark/Smoot/Russell, AJV*, 796 F.3d 424, 433 (4th Cir. 2015); *see also Twombly*, 550 U.S. at 555.

## III. DISCUSSION

**A. Motion to Compel Arbitration and, as a Result, Dismiss or Stay**

In the motion to compel arbitration, Defendants assert that the Amazon Business Solutions Agreement ("BSA") is binding on the Parties and governs this dispute.[3] This is the

[3] References herein to "BSA" refer to the document at Docket No. 24-3, or 27-3, which the Court understands to be the same document. The Parties submitted two different versions of the BSA as exhibits in the record. One is proffered as the Agreement on the date Maglula agreed to it, Dec. 16, 2016. Dkt. 27-3, Jensen Decl. Ex. A; *see also* Dkt. 24-3. The other is said to be the version of the BSA available on Amazon's site on the day of the declaration, Feb. 18, 2020. Dkt. 41-8, Smith Decl. Ex. 1. The Dec. 16, 2016 version is assumed to govern, and the Court uses it as the "BSA" for discussion. While there are notable differences between the documents, the differences do not affect the substance of the analysis herein.

agreement that Maglula clicked through and accepted to open its seller account in December 2016. The BSA states, "any dispute with Amazon or its Affiliates or claim relating in any way to the BSA or [Maglula's] use of the Services will be resolved by binding arbitration." Dkt. 24 at 1 (quoting BSA ¶ 18). Indeed, Defendants claim the Court need not even consider the applicability of these provisions—the arbitrability question—at this stage, as the Parties agreed to abide by the American Arbitration Association ("AAA") rules. BSA ¶ 18. As such, Amazon says, application of the AAA rules to the provision clearly removes the arbitrability question from the Court's purview.

Plaintiff's position is that it agreed to the BSA, but this suit does not fall within its scope, and its arbitration clause cannot control.[4] It is Amazon's burden to establish "the existence of an arbitration provision that purports to cover the dispute," Plaintiff continues, and Defendants have failed to do so. *Lovelady v. Five Star Quality Care-VA, LLC*, No. 4:18-cv-18, 2018 U.S. Dist. LEXIS 125414, at *21 (E.D. Va. July 25, 2018). This is because Maglula maintains that it never acted as a seller using its now-defunct seller's account, and, regardless, this dispute has nothing to do with Maglula's sales. Maglula proffers a clear distinction between the suite of services covered by the BSA and the infringement claims at bar; the infringement arose from conduct out

[4] While there is no dispute that Maglula agreed to the BSA to create a seller account, Maglula argues it did not elect a country in the process. As defined in the agreement, an Elected Country is "each country for which you register or elect to use a service," and the arbitration clause applies where the elected country is the United States, Canada, or Mexico. BSA ¶ 18. Maglula argues that Amazon has not produced evidence to show any election, and that it only ever indicated that it is an Israeli company. Amazon claims Maglula did not deny the United States as its Elected Country (Dkt. 43 at 5 n.4), but Maglula points out there were no allegations raised before the Reply brief and thus had taken no stance prior. Dkt. 46-1 at 5 n.6. As defense counsel noted in the March 13, 2020 hearing, there is no evidence to directly contradict Plaintiff's election of the United States, and neither party has direct documentation of an election. The Court ultimately finds the issue to be moot and declines to seek additional briefing or evidence on this issue.

of Maglula's control. Dkt. 44 at 9. As such, Plaintiff asserts that this lawsuit would exist, substantively as filed, with or without the BSA.

For purposes of this discussion, Plaintiff entertains, *arguendo*, the scenario where the BSA applies. It notes there is a carve-out for lawsuits—such as this one—to enjoin intellectual property infringement. The BSA carve-out states that binding arbitration will apply, "except that … (ii) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights." [5] BSA ¶ 18. Despite Defendants' arguments to the contrary, Maglula maintains this carve-out would be directly applicable here because the prayer for relief seeks various forms of equitable relief in addition to damages, including a permanent injunction enjoining further infringement. Compl. ¶ E.

As discussed below, the applicability of the BSA is sparsely supported; discussion of the BSA is instructive, however, in reaching the following conclusions.

*1. The Reach of the BSA*

The Parties have identified the applicability of the BSA as the prerequisite to arbitrability,[6] and it is Maglula's engagement with its seller account that determines the applicability of the BSA. It is undisputed that Plaintiff did not sell anything on Amazon.com through its seller account.[7] Nor did it engage in other seller services like order fulfillment by

[5] Governing Courts, as defined in the BSA, means "the applicable of one of the following: the state or Federal court in King County, Washington (if the Elected Country is Canada, Mexico, or the United States)."
[6] In addition to the BSA's, additional arbitration provisions in the Brand Registry terms and Amazon.com Conditions of Use become relevant to the analysis.
[7] Defendants claim "Maglula should not be permitted to hide behind its 'authorized vendors and distributors'—who do sell products on Amazon (Tal Decl. ¶ 6)—and escape applicability of the BSA simply because Maglula did not use its personal seller account to sell products and instead

Amazon, or advertising through Amazon. Identifying the breadth of "the Services," as the term is used in the BSA, is important to the inquiry.

The preamble to the BSA states, "THIS AMAZON SERVICES BUSINESS SOLUTIONS AGREEMENT (THE "**AGREEMENT**") CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR *ACCESS TO AND USE OF THE SERVICES* AND IS AN AGREEMENT BETWEEN YOU OR THE BUSINESS YOU REPRESENT AND AMAZON." BSA, General Terms (italics added, other emphases original). Amazon first tells the Court to disregard its preamble and the limitations on the Services suggested in the portion of the phrase "access to and use of." Rather, Defendants say "that the language of the arbitration provision—the specific provision—controls over the general preamble." Dkt. 44 at 7 (citing *Meijer v. Thomson*, 655 F. Supp. 2d 607, 617 (E.D. Va. 2009)). Amazon then proffers that the more specific provision includes language even more expansive than in the preamble, governing "any dispute with Amazon or its affiliates or claim *relating in any way* to this Agreement or your use of the Services," regardless of how to construe Maglula's access to or use of them.[8] BSA ¶ 18 (emphasis added).

Amazon also maintains the applicability of the BSA if "the Services" *were* subject to the preamble language, stating that Maglula did access and use Amazon services through its seller account. Plainly, Defendants say, "Maglula enjoyed the benefits of having access to and using Amazon services and information." Dkt. 24 at 10. Further, Defendants argue that the nature of Plaintiff's claims—intellectual property claims—invokes the intellectual property license and

---

acted through its authorized agents." Dkt. 44 at 9. These vendors and distributors are not relevant to Maglula's seller account and thus not relevant to this discussion.

[8] Defendant's recitation of this broad language in the arbitration provision omitted "the" before "Services," which—likely unintentionally but improperly—de-emphasizes it as a defined term in the contract. Dkt. 44 at 7.

release provisions in the BSA. The main arguments Amazon develops in its Reply to support the services claim are: Maglula created product pages; Maglula uploaded several product photos to the account; and Maglula sold products to third parties knowing that the products would end up on Amazon.com. At the hearing on this matter, Defendants argued that Maglula's use of Brand Registry leading up to this litigation was also a relevant service.

Amazon makes much of the photos uploaded to Plaintiff's seller account. It argues that the uploaded photos include content that is covered by Maglula's underlying copyright claims, invoking the intellectual property license provision. What is more, Defendants point to paragraphs 27 and 28 of the Complaint to allege that these claims are related to the photographs. Dkt. 1. Plaintiff clarified in open court that paragraph 27 claims copyrights in the packaging, not the products, and the packaging is wholly absent from the photos. Paragraph 28, Plaintiff said, is similarly unrelated to the photos, as placing those photos on the account is not alleged to have any effect on the underlying claims. Plaintiff maintains the license provision is irrelevant.

Maglula contends that the BSA has limits, and "only applies to disputes relating to the suite of services that Maglula gained access to by registering as a seller." Dkt. 40 at 3. As Plaintiff points out, the "Definitions" section of BSA's General Terms states the following:

> "**Service**" means each of the following services: Selling on Amazon, Amazon Webstore, Fulfillment by Amazon, Amazon Clicks (including Amazon Sponsored Products), the Marketplace Web Service, and, if the Elected Country for a Service is the United States, the Transaction Processing Services, together in each case with any related services and materials we make available.

*Id.* (emphasis original). This "suite of services" is consistent with the message introducing the agreement, even before the preamble, that says "Welcome to **Amazon Services Business Solutions**, a suite of optional services for sellers including: Selling on Amazon, Amazon

Webstore, Fulfillment by Amazon, Amazon Clicks, Transaction Processing Services, and the Marketplace Web Service."[9] *Id.* (emphases original, underline as hyperlink).

Plaintiff maintains that no "significant relationship exists between the claim and the agreement, regardless of the legal label attached to the dispute." Dkt. 41 at 8 (citing *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 93-94 (4th Cir. 1996)). Further, Plaintiff points to *VS Techs., LLC v. Twitter, Inc.*, No. 2:11CV43, 2011 U.S. Dist. LEXIS 157536, at *17 (E.D. Va. June 28, 2011), where the forum selection clause in Twitter's terms of service did not control because the patent infringement claims at issue were not based on the plaintiff's "access to and use of" Twitter's website services. Likewise, Maglula argues its claims are wholly unrelated to Amazon's business solutions services, or Maglula's alleged use of them. Plaintiff also submits a host of problems with respect to principles of contract interpretation should Amazon's application of the BSA prevail.

Notably, Plaintiff argues that Defendants did not conduct themselves as if the BSA applied to Plaintiff's claims in the time lead-up to the litigation. The effort to bind Maglula to the BSA, Plaintiff claims, came after Amazon's conduct steered Maglula in a different direction: toward Brand Registry. Plaintiff offers evidence of interactions with and affirmative representations from Amazon representatives that are inconsistent with Defendant's current, broad interpretation of the BSA. There is email correspondence with Josh Cowan, a former vendor manager at Amazon, who informed Plaintiff's CEO that Maglula was not an Amazon vendor and that the complaints were "ABSOLUTELY due to Brand Registry." Dkt. 46-1 at 2.

[9] Updates to the BSA have since altered the suite of services, and substituted new names, but the general structure of the contract remains the same.

Maglula states that Amazon repeatedly directed it to Brand Registry channels as opposed to its seller account.

Indeed, Brand Registry has its own terms of agreement. Further, one does not have to be a seller or have a seller's account to join Brand Registry, as it is "free to any rights owner with a government-registered trademark, regardless of their economic relationship with Amazon." Dkt 49-15, Smith Decl. Ex. 5 at 3. In other words, "seller" status was never relevant to Brand Registry. It is separately defined and stands as an independent service outside the suite of services identified in the BSA.

Plaintiff's claim also suggests that Maglula was never on notice that the BSA might apply to its infringement complaints. All indicia from Amazon pointed to Brand Registry. Dkt. 49 at 1-2 (recounting multiple representations since 2017). The Brand Registry terms include a "Dispute Resolution" provision that incorporates Amazon's essentially universal "Conditions of Use" agreement:

> 8. Dispute Resolution. Any dispute or claim relating to these terms or any Brand Registry service is subject to the arbitration, class action waiver, and governing law provisions in the Amazon.com Conditions of Use, which are incorporated by reference.

Dkt. 40-3 at 3 (underline as hyperlink in original). The Conditions of Use ("COU") agreement has an arbitration provision that is similar to, but not the same as, the arbitration provision in the BSA. It comprises four paragraphs; the first and the last are:

> **Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court,** except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement. . .
>
> **We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative**

> **action.** If for any reason a claim proceeds in court rather than in arbitration **we each waive any right to a jury trial.** *We also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.*

Dkt. 40-4, Tal Decl., Ex. 3 (italics added, bold face original).

Considering these arguments and contract provisions, the parties are bound—if at all—by the Brand Registry terms and, therefore, the COU carve-out. The question before the Court addresses the second of the four elements in *Adkins*: an arbitration provision which purports to cover the dispute. Here, there is no such provision through the BSA.

While the Fourth Circuit is cognizant of the Supreme Court's "healthy regard for the federal policy favoring arbitration," it is not without limits. *Am. Recovery Corp.*, 96 F.3d at 92 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24 (1983)). Indeed, "[i]t is clear that 'even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate.'" *Adkins*, 303 F.3d at 501 (quoting *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997)). The BSA defines its suite of services, none of which relate to Plaintiff's Complaint. Even if, *arguendo*, Plaintiff's actions on the seller account, like creating product pages or uploading photos, were sufficient to implicate the BSA's Selling Service, that would not change the outcome. As in *VS Techs. v. Twitter*, 2011 U.S. Dist. LEXIS 157536 at *15, where the "claims simply [we]re not based on [the plaintiffs']'access to and use of' services provided by Twitter's website," Maglula's claims simply are not based on its seller account.[10] The Services as identified in the BSA do not apply here, because Maglula's claims only address sales that are not its own.

---

[10] Maglula's seller account was formally closed on September 5, 2019. Dkt. 24-1, Jensen Decl. ¶ 11. Maglula requested the account be closed in May 2019. Dkt. 41 at 5. This is only important to the extent that it illustrates the seller account's existence had and has no bearing on the underlying Complaint.

Furthermore, Amazon's conduct further distanced the BSA from the dispute when it directed Maglula to Brand Registry, a separate and independent service. Amazon representatives, time and again, indicated Brand Registry applied to Plaintiff's complaints. In June 2017, Defendants expressly steered plaintiff to Section 8 of "the terms," referring to Brand Registry's specific Dispute Resolution provision. *See* Dkt. 49-3. Defendants' claim that the BSA's arbitration provision now supplants Brand Registry's is baseless.

In August 2018, Maglula "joined Amazon's Brand Registry program," but found it to be ineffective. Dkt. 41 at 4 (citing Tal Decl., ¶ 9). The lion's share of the record focuses on the BSA, and there is scant factual information regarding Plaintiff's account or use of the Brand Registry account.[11] Plaintiff's Sur-reply to Defendants' motion to transfer includes a header at Part I.A.1 that reads, "If Anything, Brand Registry Applies." Dkt. 49 at 1. Based on the current record, the Court agrees. Pursuant to the above-quoted provisions, the Brand Registry terms—and therefore the COU, not the BSA provisions—purport to cover this dispute.

*2. Threshold Question of Arbitrability*

The Parties focused on the BSA as the basis of their arguments on this topic. The Court responds to the BSA-related arguments in the briefing, noting that the provision in the COU is subject to much of the same discussion and analysis. This discussion, then, applies in all relevant parts to the Court's conclusions regarding the COU's arbitration provision.

The threshold question of arbitrability is whether the court or the arbitrator determines arbitrability of the action. "The Court's task is not to determine whether certain issues are arbitrable, but whether a valid delegation provision exists." *Gibbs v. Stinson*, No. 3:18cv676,

[11] Amazon allegedly refused to recognize Maglula's common-law trademarks when attempting to use Brand Registry. The trademarks have since been registered with the USPTO. Dkt. 41 at 4-5. The Complaint says "Maglula attempted to join Amazon's 'Brand Registry'..." Dkt. 1 ¶ 4.i.

2019 WL 4752792, at *12 (E.D. Va. Sep. 30, 2019). The delegation question is subject to the "clear and unmistakable" standard, and "[t]hose who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect." *Peabody*, 665 F.3d at 102 (quoting *Carson v. Food Giant, Inc.*, 175 F.3d 325, 330-31 (4th Cir. 1999)).

Defendants argue that the AAA rules indicated in the arbitration provision demonstrate a "clear and unmistakable" agreement to arbitrate arbitrability as to all disputes arising under the BSA. *See Brenco*, 297 F. Supp. 3d at 610-11 (finding that the "clear and unmistakable" standard was met despite a carve-out to protect "each party's right to seek injunctive or mandatory relief from a court."). Indeed, Amazon asserts the applicability of the AAA rules in the provision is dispositive, as "[a] contract need not contain an express delegation clause to meet this standard ... an arbitration agreement that incorporates the AAA rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 279 (5th Cir. 2019) (*Schein II*) (internal quotations and citations omitted).

Not only is this agreement clear on its face because of the AAA clause, Amazon claims, but it is supported by the recent *Schein* cases.[12] In *Schein I*, the Supreme Court found that the "wholly groundless" exception allowing district courts to bypass arbitration of meritless claims was inconsistent with the Federal Arbitration Act.[13] In other words, if the contract clearly

[12] *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) (*Schein I*); *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281-82 (5th Cir. 2019) (*Schein II*) (collectively, *Schein*).

[13] The Supreme Court described the "wholly groundless" exception this way: "[e]ven when a contract delegates the arbitrability question to an arbitrator, some federal courts nonetheless will short-circuit the process and decide the arbitrability question themselves if the argument that the arbitration agreement applies to the particular dispute is 'wholly groundless.' The question

delegated arbitrability to an arbitrator, *Schein I* held that the district court could not bypass that delegation, regardless of the claim. But the Supreme Court remanded the case to the Fifth Circuit to address the threshold question of delegation – whether the dispute was subject to the strict arbitration requirements. In *Schein II*, the Fifth Circuit parsed the carve-out provision and determined that the arbitrability question, along with the underlying disputes, was carved out for the courts.

Defendants maintain, "[a]lthough the [Fifth Circuit] ultimately determined that the clear and unmistakable delegation stemming from the AAA rules applied only to disputes falling outside of a carve-out, that case is distinguishable because the carve-out in *Schein* followed a different syntax than the one in the BSA." Dkt. 44 at 5. Because the instant carve-out is not in the middle of a sentence—as it was in *Schein II*—Defendants distinguish it and rely on the presence of AAA later in the provision, which was determinative in *Schein I*.[14]

Maglula contends that the *Schein* progeny limits the application of AAA rules here, and the Fifth Circuit's analysis applies. Amazon is elevating form over substance with its syntax argument, Plaintiff says, and for the Fifth Circuit to call the placement "'dispositive' on those facts … is not to say such placement is *necessary*." Dkt. 50 at 1 (emphasis original). The relationship between the carve-out and the reference to the AAA rules in the BSA is as follows, each indicated in bold face:

> … will be resolved by binding **arbitration as described in this paragraph**, rather than in court, **except that (i) you may assert claims in small claims court**

---

presented in this case is whether the 'wholly groundless' exception is consistent with the Federal Arbitration Act. We conclude that it is not." *Schein I*, 139 S. Ct. at 527-28.

[14] The Agreement in *Schein* said, "[a]ny dispute arising under or related to this Agreement (except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property of [the predecessor]), shall be resolved by binding arbitration *in accordance with the arbitration rules of the American Arbitration Association*." *Schein II*, 935 F.3d at 280 (alterations and emphases original).

> **that is a Governing court if your claims qualify and (ii) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights.** There is no judge or jury in arbitration, and court review of an arbitration award is limited, However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would. To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent, CSC Services of Nevada, Inc., 2215-B Renaissance Drive, Las Vegas, NV 89119. **The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. ...**

BSA ¶ 18 (emphasis added). The plain language of the BSA separates the AAA rules from the carve-out, Plaintiff continues, regardless of the carve-out's placement in its own sentence. Maglula argues that to call the syntax of the carve-out determinative, as Amazon does, is to mischaracterize the holding in *Schein II.*

On the issue of arbitrability, the Court agrees with Plaintiff. The scope of what the parties agreed to arbitrate is undeniably an issue for the court to decide, unless there is a clear and unmistakable election to arbitrate a particular question. *Schein II*, 935 F.3d at 279 (citing *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (1986)). Here, as in *Schein*, the plain language of the BSA indicates the carve-out is treated separately from the rest of the paragraph. The AAA rules apply only to "the arbitration," and "arbitration as described in th[e] paragraph" does not apply to the carve-out. As a result, the AAA rules do not govern arbitrability. The syntax in the BSA, if anything, weakens Amazon's argument. In *Schein*, the AAA reference was in the same sentence as the carve-out. Here, the applicability of AAA comes later in the paragraph; the separation is neater and more pronounced.

To be clear, per Amazon's argument, the Ninth Circuit in *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) said, "[v]irtually every circuit to have considered

the issue has determined that incorporation of the [AAA rules] constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle* then cited, *inter alia*, to the Fifth Circuit in support of this claim. But this citation is inapposite, as the Fifth Circuit only found the clear and unmistakable standard was met in a case where there was no carve-out.[15] Given the carve-out in *Schein*, the Court found differently.

So too, here. "Although [the Fourth Circuit] ha[s] adopted a general policy-based, federal presumption in favor of arbitration, that presumption is not applied to resolve questions of arbitrability issues themselves." *Peabody*, 665 F.3d at 102 (internal quotations and citations omitted). The circumstances at bar and the plain language of the BSA raise a substantial question as to arbitrability; as a result, the clear and unmistakable standard is not met.

The same arguments apply to the COU, where there is even more separation between the carve-out and the arbitration discussion. Rather than at the end of a sentence within the paragraph, as in the BSA, the carve-out in the COU is an express exception at the end of the four-paragraph provision:

> Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement. . .
>
> There is no judge or jury in arbitration, and court review of an arbitration award is limited …
>
> To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent … *the arbitration will be conducted by the American Arbitration Association (AAA) under its rules*, including the AAA's Supplementary Procedures for Consumer-Related Disputes …

[15] *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671 (5th Cir. 2012).

> We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. If for any reason a claim proceeds in court rather than in arbitration we each waive any right to a jury trial. *We also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.*

Dkt. 40-4, Tal. Decl., Ex. 3, at 4 (original emphasis omitted) (italics added). There is no intertwinement between the COU carve-out and the AAA rules. In sum, "[t]he arbitration will be conducted" according to the AAA rules under the COU, but suits "to enjoin infringement or other misuse of intellectual property" may take place outside of arbitration. The language is clear, and AAA rules do not apply to such suits. *See Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 830 F.3d 1335, 1340 (Fed. Cir. 2016) ("The pertinent language of the arbitration provision is unambiguous and makes clear that disputes relating to issues of patent scope and infringement are not subject to mandatory arbitration.") (internal quotation marks omitted).

"[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Intn'l Bhd. Of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis original). In sum, the Court is not satisfied that the Parties agreed to arbitrate the instant dispute, as there is no express delegation of the question to an arbitrator.

*3. The "Suit" Within the Carve-Out*

As the appropriate entity to determine arbitrability, the Court next considers whether the suit falls within the carve-out if the COU governs. Amazon further seeks to limit its scope to actions seeking *only* injunctive relief. Because Plaintiff's prayer for relief also includes damages, Defendants argue the carve-out is inapplicable. Plaintiff filed a sur-reply, claiming Amazon is trying to re-characterize "claims" as separate from a "suit," asserting an eligible lawsuit cannot include anything but injunctive relief. Maglula contends this is inconsistent with

the plain language of the agreement, and the argument is waived both because it was not raised earlier, and because Defendants already conceded it was an infringement suit in its pleadings.

In *Schein II*, the Fifth Circuit addressed this very question, saying:

> [T]he arbitration clause creates a carve-out for 'actions seeking injunctive relief.' It does not limit the exclusion to 'actions seeking *only* injunctive relief,' nor 'actions for injunction in aid of an arbitrator's award.' Nor does it limit the carve-out to *claims* for injunctive relief. Such readings find no footing within the four corners of the contract.

935 F.3d at 281-82. The Court agrees with this analysis and conclusion. Defendants have no basis to add a limitation to the plain language of the BSA; if the BSA controls here, so does its carve-out. Likewise, the same would be true for the COU. There is no such limitation to actions seeking *only* injunctive relief, and Plaintiff's is an eligible suit within the COU carve-out.[16]

The upshot is that the Court finds the suit is not subject to any arbitration provision, and there is no contractual limitation on the forum in the federal courts.[17] Indeed, the COU states that either party "may bring suit in court," without specifying which court, as there is no forum selection clause in the agreement.[18]

[16] There is also comparable litigation involving Amazon.com where relief is not limited to enjoining infringing actions. *See, e.g.*, *Amazon.com v. Kurth*, No. 2:18-cv-00353-RAJ, 2019 U.S. Dist. LEXIS 126777, at *3 (W.D. Wash. Jul. 30, 2019) (litigating in federal court based on Defendant's use of her Amazon Seller Account, where"Plaintiffs moved to enter default judgment against Kurth on all claims, seeking actual and statutory damages, a permanent injunction and attorney's fees.").

[17] While there is no express limitation on forum, the COU's Applicable Law provision is incorporated into Brand Registry's terms such that "the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon." Dkt. 40-4, Tal Decl., Ex. 3.

[18] Instead of "court" as in the COU, the BSA specifies the ability to bring suit in the "Governing Courts" as defined in the BSA, which specifies the state or federal court in King County, Washington.

*4. Waiver Due to Rule 12(b)(6) Motion*

Finally, Plaintiff argues that Amazon waived its right to arbitrate because it sought a substantive federal court disposition on the merits via its motion to dismiss under Rule 12(b)(6). The Fourth Circuit standard is that "[a] litigant may waive its right to invoke the Federal Arbitration Act by so substantially utilizing the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." *Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 817 F.2d 250, 252 (4th Cir. 1987) (quoting *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985)). The dispositive question is whether the objecting party has suffered actual prejudice. *Fraser*, 817 F.2d at 252. Here, Maglula argues there is actual prejudice because of the combination of delay and expense – Defendants not only sought and received an extension to respond, but also used that time to prepare three briefs requiring Plaintiff's responses. Maglula focuses on the motion to dismiss under Rule 12(b)(6), as that asks the Court for a judgment on the merits, which it argues is inconsistent with resolution by arbitration. *See Lewallen v. Green Tree Servicing, LLC*, 487 F.3d 1085, 1092 (8th Cir. 2007) (holding a request for the bankruptcy court to dispose of the case on the merits before seeking arbitration is inconsistent with resolving the case through arbitration).

Defendants strongly contest waiver. Indeed, there is a heavy burden to prove waiver when opposing arbitration. At this early stage in the litigation, Amazon maintains Plaintiff's supporting arguments are inapposite – the "heavy burden . . . is not necessarily satisfied even if the party has spent time and resources in discovery activity and motions practice over a period of years." *Fasig-Tipton Ky., Inc. v. Michaelson*, 955 F.2d 40 (Table) (4th Cir. 1992); Dkt. 44 at 17. Furthermore, Defendants cite case law indicating that a delay of eight months is not enough on

its own to show waiver, nor is it enough to show sufficient utilization of the "machinery of litigation" to file two declaratory judgment actions and respond to a motion to dismiss. Dkt. 44 at 16. Here, Maglula waited approximately two months, and responded to motions dealing almost entirely with procedural issues. Plaintiff leans heavily on *Lewallen*, where the delay was approximately eleven months, there was discovery, and the court recognized the parties' progress down the road of trial preparation. 487 F.3d at 1091-93. The facts at bar do not compare.

For several reasons, Plaintiff's reliance on *Khan v. Parsons Global Servs.*, 521 F.3d 421 (D.C. Cir. 2008) is also misplaced. Plaintiff argues that the motion in *Khan* was a Rule 12(b)(6) motion, not a summary judgment motion, that created a waiver because of its inclusion of material beyond the pleadings. Dkt. 50 at 4. Not so. The "motion [was] one for dismissal of the complaint, or, in the alternative, for summary judgment." *Khan*, 521 F.3d at 427. The *Khan* court explained that this characterization of the motion was not probative, as the Court interpreted it as a motion for summary judgment. Moreover, "the limited extent of [] litigation activity [wa]s of no moment" in *Khan*, as the litigation posture was such that "discovery would likely focus almost entirely on documents and testimony in the possession and control of [the defendant]." *Id.* at 428. Contrary to the instant action, which is in its infancy, the motion in *Khan* was being considered within "the second appeal by [the plaintiffs]." *Id.* at 423. Despite the title of the motion at issue, the litigation history was extensive; the context was drastically different.

A large part of Defendants' motion to dismiss is aimed at the adequacy of the Complaint, and only addresses a fraction of the underlying merits in the patent inducement arguments. Even, *arguendo*, considering the merits as they relate to inducement of patent infringement, Defendants did not provide any relevant supporting materials for that inquiry with its motion to

dismiss. The three attachments to the motion to dismiss all pertain to Amazon's corporate structure and Amazon.com Services' conversion from a corporation to an LLC. Dkt. 21, Exs. 1-3. Thus the Court declines to consider the Rule 12(b)(6) motion as one for summary judgment.

Ultimately, Defendants must prevail regarding waiver of arbitration. The instant delay was an agreed-upon extension, and is far shorter than many that were found to be non-prejudicial in other cases. Further, there has been no discovery in this case, and the parties are far from trial preparation at this stage. Defendants' three motions and the Parties' thorough briefing have demanded a significant amount of time and expense, but Plaintiff's heavy burden is not met.

*5. Conclusion*

For these reasons, the BSA does not apply to this suit, and the Parties are not bound to arbitrate pursuant to the BSA provision. The Brand Registry terms may apply here, invoking the COU, but they would not require arbitration of these claims. Under either arbitration provision, the action is carved out of the reach of the AAA rules, and the district court would be the proper decision-maker for arbitrability. Applying the COU terms, the instant suit would fall under the applicable carve-out, and would not be bound by a forum selection clause. Accordingly, the Motion to Compel Arbitration is denied.

**B. Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)**

The motion to transfer venue to the Western District of Washington ("W.D. Wash.") states that, although this case should not be in district court, there is a forum selection clause in the BSA indicating W.D. Wash. as the proper district. Per the above discussion, the BSA does not apply to this dispute, thus its forum selection provision does not control.[19] And where there is no valid forum-selection clause, there is no need for "district courts to adjust their usual [28

---

[19] The Brand Registry terms and COU do not have a forum selection clause.

U.S.C.] § 1404(a) analysis in three ways." *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013). Rather, the motion to transfer is considered under § 1404(a), where "'the decision whether to transfer an action under the statute is committed to the sound discretion of the district court.'" *comScore, Inc. v. Integral Ad Sci., Inc.*, 924 F. Supp. 2d 677, 681 (E.D. Va. 2013) (quoting *Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 667 (E.D. Va. 2010)).

The § 1404(a) inquiry begins with jurisdiction, as the Court must establish that "the case 'might have been brought' in that district" in the first instance. *U.S. Ship Mgmt. v. Maersk*, 357 F. Supp. 2d at 930. As this case invokes federal intellectual property statutes and related claims, there is federal question subject matter jurisdiction under 28 U.S.C. § 1331. Indeed, under § 1400(b), "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides."[20] Both Defendants are incorporated or formed in Delaware with a principal place of business in Seattle, Washington. As they are corporate entities, "the place of incorporation and principal place of business are paradig[m] … bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (internal quotation omitted, alterations original). It follows that Defendants are subject to general personal jurisdiction in Washington and the case could have been brought in W.D. Wash. in the first instance.

The next step of the inquiry is whether a transfer would serve the convenience of the parties and witnesses, in the interest of justice. 28 U.S.C. § 1404(a). The burden is on the moving party to show that transfer is proper. *JTH Tax, Inc. v. Lee*, 482 F. Supp. 2d 731, 736 (E.D. Va. 2007). As noted above, the relevant factors to consider are: "(1) the weight accorded

---

[20] The Court is cognizant that the transfer inquiry at bar is based on 28 U.S.C. § 1404(a), not § 1400.

to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters*, 791 F.3d at 444. To balance conveniences, the court considers "factors such as the 'ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the availability of compulsory process.'" *Lycos, Inc. v. TiVo, Inc.*, 499 F. Supp. 2d 685, 693 (E.D. Va. 2007) (quoting *Samsung Elecs. Co. v. Rambus Inc.*, 386 F. Supp. 2d 708, 717 n.13 (E.D. Va. 2005). "The statute provides no guidance as to the weight that should be given to the various factors." *Samsung*, 386 F. Supp. 2d at 716.

The factors are addressed in turn.

*1. The Weight Accorded to Plaintiff's Choice of Venue*

Typically, a plaintiff's choice of forum is entitled to substantial weight, and "where 'a plaintiff [] prove[s] a legitimate connection to the [chosen] district,' this factor 'strongly weigh[s] against transfer.'" *comScore, Inc.*, 924 F. Supp. 2d at 682 (quoting *Pragmatus AV, LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 995 (E.D. Va. 2011)). But "when a plaintiff chooses a foreign forum and the cause of action bears little or no relation to that forum, the plaintiff's chosen venue is not entitled to such substantial weight." *Cognitronics*, 83 F. Supp. 2d at 696 (internal quotation omitted) (collecting cases). "[F]oreign plaintiffs' choices of venue are generally given less deference, because the assumption that the chosen forum is convenient becomes 'much less reasonable.'" *NanoEntek, Inc v. Bio-Rad Laboratories, Inc.*, No. 2:11-cv-427, 2011 WL 6023189, at *2 (E.D. Va. Dec. 2, 2011) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)). "It is well-settled that the mere existence of limited sales activity within Virginia does not require this court to give the plaintiff's choice of forum substantial weight when balancing the convenience and justice factors." *Lycos*, 499 F. Supp. 2d at 692.

Defendants offer minimal or no deference to Maglula's choice of venue, arguing that the cause of action is not uniquely related to this district, and Plaintiff is not at home in this forum. Any conduct related to the parties in Virginia, Defendants say, is meaningless because there is nothing that distinguishes this forum from any other. Defendants argue Maglula fails to provide any indication why Virginia sales should receive deference, noting that the Court should disregard test sales in Virginia as manufactured contacts. Amazon specifically addresses this in its Reply: "the handful of allegedly infringing sales made to Maglula's lawyer do not constitute a substantial connection to this forum." Dkt. 43 at 15. Further, in the March 13, 2020 hearing, Defendants argued that any military sales contracts should be given little weight because this is the Washington, D.C. area, and government contractors should not be able to clog the docket just because the government is located here.

Plaintiff contends that there are unique contacts with Virginia for both Maglula and Amazon, thus there is reasonable and logical support for its choice of forum. It claims that Defendants have the burden to show "the balance of factors weighs *strongly* in favor of transfer." Dkt. 41 at 17. Plaintiff corrects Amazon's assertion that the only allegedly infringing sales claimed in this case were test sales, as the record contains evidence of legitimate sales to independent third parties in Virginia. *See* Compl. at 29. Maglula's sur-reply also discusses specific targeted business in Virginia, as the company is in talks with the Marine Corps out of Quantico, Virginia, regarding the StripLULA® and UpLULA® products, both at issue in this case. There are also alleged exchanges with the Coast Guard in Centreville and Chesapeake,

Virginia, as well as past sales to military/tactical gear stores in Virginia Beach and Quantico, and localized distribution through US21 Inc., headquartered in Fairfax.[21]

Given the broad reach of the claims at bar and a foreign forum, Plaintiff's choice to bring suit in the Eastern District of Virginia is accorded less weight than if the plaintiff were at home. *See Samsung*, 386 F. Supp. 2d at 716. It is true that Maglula's infringement claims are in large part geographically general, and "if there is little connection between the claims and this judicial district, that would militate against a plaintiff's chosen forum and weigh in favor of transfer to a venue with more substantial contacts." *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 635 (E.D. Va. 2003). But there are *some* specific contacts in the district, and no obvious district court venues where *Maglula* has more substantial contacts. Indeed, "the plaintiff's choice of forum is certainly a relevant consideration so long as there is a connection between the forum and the plaintiff's claim that reasonably and logically supports the plaintiff's decision to bring the case in the chosen forum." *Samsung*, 386 F. Supp. 2d at 716. Here, third party alleged counterfeit sales as well as the Marine Corps and Coast Guard contacts in Virginia give Maglula such a connection.

Further, the nature of the widespread alleged infringement may give additional credence to the chosen forum. In *Beam Laser Sys. v. Cox Commc'ns, Inc.*, 117 F. Supp. 2d 515, 519 (E.D. Va. 2000), the court addressed the importance of center of the accused activity where the infringing action occurred. If the infringing activity in this case is widespread, the center of the accused activity is far from established. *See id.* ("[T]he nationwide character of the alleged infringement does not diminish [the] choice of Virginia as its forum, however: If there is no

---

[21] This is in addition to the sales that are undisputed at stores like Cabela's in Gainesville and Short Pump, Dick's Sporting Goods in Fairfax, and Bass Pro Shops in Ashland. Defendants maintain these contacts are not unique to Virginia and should be afforded no weight.

center of infringement activity in a particular case, then, as long as the plaintiff brings its action in a forum where the alleged infringement is occurring, that choice should not be undermined by allegations that infringing activities occur throughout the country.").

Notwithstanding these arguments, Plaintiff at times overstates the deference that is due to its choice of venue, relying largely on cases where plaintiffs chose their home forums in the first instance. *See, e.g.*, *WiAV Sols. LLC v. Motorola, Inc.*, Civ. No. 3:09cv447, 2009 U.S. Dist. LEXIS 96994, at *3-4 (E.D. Va. Oct. 20, 2009) (plaintiff based in Vienna, Va.); *Heinz Kettler GmbH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 667 (E.D. Va. 2010 (plaintiff based in Virginia Beach, Va.); *comScore*, 924 F. Supp. 2d at 682 ("Here, not only is the Eastern District of Virginia Plaintiff's home forum, but also Plaintiff's strong presence and active development of products subject to the patents-in-suit in this District provide Plaintiff with legitimate and significant connections to this District sufficient to weigh strongly against transfer.") (internal quotations omitted); *see also Cognitronics*, 83 F. Supp. 2d at 696 (quoting *Corry v. CFM Majestic Inc.*, 16 F. Supp. 2d 660, 666 (E.D. Va. 1998)) ("'[a] plaintiff's choice of forum . . . is here of little moment because it is neither plaintiff's nor defendants' home forum.'").

Ultimately, Maglula's sales in Virginia will be largely incidental to Plaintiff's business rather than catered to the forum, but not entirely so. Plaintiff's past sales or potential contracts with military organizations and suppliers in Virginia are unique to the forum and potentially a substantial and important client. As Maglula noted at the March 13, 2020 hearing, these ongoing contract negotiations are more than just evidence of sales in Virginia – they are connected to the claims at bar because of the reputational damage that ongoing infringement causes. And non-test sales in Virginia include a return of an allegedly infringing product, linking *this suit* to the sale, not just Maglula to the forum. Plus, courts have awarded weight to a plaintiff's forum choice

based on defendants' business ties to that forum, and Amazon has recently and very publicly announced its forthcoming "HQ2" in E.D. Va. *See, e.g.*, *Limelight Networks, Inc. v. XO Commc'ns LLC*, Civ. No. 3:15-cv-720-JAG, 2016 U.S. Dist. LEXIS 168684, at *8-9 (E.D. Va. Aug. 3, 2016) (giving initial forum selection weight where alleged infringers had established places of business, one with a headquarters, in Virginia).

Maglula's choice of venue is a legitimate consideration due some deference.

*2. Witness Convenience and Access to Proof*

The convenience of witnesses is of considerable importance in the § 1404(a) inquiry. *Samsung*, 386 F. Supp. 2d at 718. "The party asserting witness inconvenience has the burden to proffer, by affidavit or otherwise, sufficient details respecting the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience." *Id.* (quoting *Koh*, 386 F. Supp. 2d at 636). "[M]erely stating potential witnesses reside beyond a forum's subpoena power does little to assist the court in weighing the convenience of the witness and the necessity of compulsory process." *Id.* at 719.

Defendants assert that the vast majority, if not all, of the known, relevant witnesses are in W.D.Wash., and none are in Virginia. Maglula's exhibits to its Complaint include the names of three Amazon employees, all of whom, Defendants point out, are in Seattle. Amazon also notes that the prosecuting attorney for both patents asserted in this case is a resident of San Francisco, California, which is far closer to W.D. Wash. than E.D. Va. Moreover, Amazon explains that relevant documentation and witnesses with knowledge of the infringement notices are all in Washington. The Western District of Washington is undoubtedly preferred as "the center of the accused activity" in this case, Amazon proffers, because the abuse team and all relevant

witnesses with access to relevant documents are in Washington. *See* Dkt. 43 at 9 (quoting *Beam*, 117 F. Supp. 2d at 518 (E.D. Va. 2000)).[22]

Maglula's main point in opposition is that Amazon almost exclusively cites party witnesses in support of its argument, and party witnesses can be secured without the necessity of compulsory process. Courts draw "a distinction . . . between party and non-party witnesses," because party witnesses "are presumed to be more willing to testify in a different forum." *See comScore, Inc.*, 924 F. Supp. 2d at 688 (quoting *Samsung Elecs. Co., Ltd. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 718 (E.D. Va. 2005)). Plaintiff also counters that three employees Defendants point to from the pleadings are not significant, especially when Amazon does not characterize their proposed testimony. Aside from the few employees discussed, "Amazon touts having 8,000 employees who focus on 'preventing counterfeits, unsafe products, and other types of abuse in [Amazon's] store.'" Dkt. 49 at 7 n.9 (quoting Smith Sur-Reply Decl., ¶ 7, Ex. 5). Further, Plaintiff says, "discovery will likely be taken from several witnesses who work at Amazon warehouses throughout the country," Dkt. 41 at 26-27, and "Maglula plans to obtain information from [] Virginia warehouses in discovery and understand how and why they are shipping counterfeit Maglula products." Dkt. 49 at 8.[23] Plaintiff also expressed willingness to depose Amazon employees where they reside, eliminating potential inconvenience in that regard. Dkt. 41 at 24 n.7.

[22] Amazon claims "the center of the accused activity" is in Seattle because of accusations about how infringement reports were handled rather than the actual underlying infringement conduct, which was the relevant consideration in *Beam*.

[23] Plaintiff also cites a March 4, 2020 hearing before the House Subcommittee on Consumer Protection and Commerce, where Amazon's Vice President of Worldwide Customer Trust and Partner Support testified about comingling products from different sellers and methods used to fill orders from existing inventories. This, Plaintiff says, will be relevant to discovery, particularly for the UpLULA® products.

Neither Party provides compelling arguments regarding witness convenience. Amazon's Seattle, Washington headquarters is given some weight, for witnesses as well as acquisition of documents and other evidence. This tips in Defendants' favor also because Maglula chose a foreign forum in the first instance. Plus, it is true that Amazon's HQ2 in Arlington, Virginia is not yet established, and it will not figure specifically for witnesses in this case. Maglula references warehouses in the vicinity of E.D. Va., but it is not clear that these warehouses are any more case-specific or significant than those in other forums, and witnesses and testimony associated with these locations are yet unnamed.

Plaintiff makes valid points regarding Defendants' proffer of party witnesses. As third-party witnesses are afforded the most weight in a § 1404 analysis, the patent prosecutor, David Pressman, in San Francisco is thus far the only non-party witness, or non-former employee, to tip the scale. Defendants have only provided an address to show Mr. Pressman's geographic proximity, and have not indicated an unwillingness to travel for purposes of this litigation. Again, Plaintiff expressed willingness to depose Amazon employees where they reside, nullifying a significant portion of potential inconvenience. Dkt. 41 at 24 n.7.

In sum, convenience of witnesses and access to proof does not weigh heavily for or against transfer.

*3. The Convenience of the Parties*

The Western District of Washington is the most convenient forum for Defendants. Defendants argue it is preferable because its headquarters are in Seattle, the Amazon Selling Partner Abuse team processes infringement notices and is managed from there, most Amazon personnel are located there, along with at least three potential witnesses named in this case. Dkt. 27 at 13 (citing Yang Decl.). The facilities Amazon operates in Virginia are no different from

those across the country, Defendants continue, and Maglula has not alleged that any Amazon employees living in this district have knowledge relevant to this case. Defendants emphasize that Maglula's claims all focus on Amazon's responses to its infringement notifications – the witnesses and documents relevant to said responses are in Washington. Indeed, Defendants maintain that the "center of the accused activity" is in Washington. Dkt. 43 at 9.

Plaintiff focuses on Defendants' burden to prove "'that the circumstances of the case are strongly in favor of transfer.'" *comScore, Inc*, 924 F. Supp. 2d at 681 (quoting *Heinz Kettler GMBH*, 750 F. Supp. 2d at 667 (emphasis original)). Maglula contends that demonstrating the existence of a more convenient venue is not sufficient.[24] Regardless, Plaintiff goes on to detail Amazon's contacts with the forum, arguing they are much more than just incidental to nation-wide sales and business operations. Maglula proffers there are Amazon facilities in Petersburg, Chester, and Ashland, Virginia, and Amazon is opening a second headquarters, HQ2, in this district. This forthcoming HQ2 has prompted Amazon to lease office space and post over 1,500 jobs in the district. Dkt. 41 at 21. HQ2 is an added convenience for Defendants in litigation; even if it is not operational as a headquarters, Plaintiff continues, it is a foothold in Arlington for Amazon. As for discovery proceedings, Plaintiff notes that the "age of electronic discovery" can accommodate distances large and small, and parties need not be located in any specific district to access electronic materials.

It must be said that Amazon is nothing if not ubiquitous in the United States. Furthermore, after considering 238 cities, Amazon chose Arlington in the Eastern District of Virginia as the location for its HQ2, and will invest $2.5 billion and 25,000 jobs in the

[24] As noted above regarding plaintiff's choice of forum, this standard is likely inapplicable where the chosen forum is foreign to the plaintiff.

undertaking."[25] As such, Amazon cannot in good faith represent to the Court that E.D. Va. is an undesirable or inconvenient location to operate and do business. Litigating should not be an additional significant strain. What is more, Maglula is a small company of ten people, and the east coast is significantly—approximately 3,000 miles—closer to its Israeli base than the west coast.

In sum, Defendants have not shown that weighing conveniences warrants transfer.

*4. The Interest of Justice*

Some considerations in this factor include related actions, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, and the possibility of harassment. *Koh*, 250 F. Supp. 2d at 639 (citation omitted). The parties mainly dispute Plaintiff's choice of the Eastern District of Virginia for speedy resolution at "the rocket docket."

Amazon calls Maglula's filing undeniable forum shopping, and states the interests of justice are not served. Defendants note that forum shopping is a legitimate consideration and can be held against a party when appropriate.[26] Indeed, Defendants claim that W.D. Wash. is well-equipped to handle the case and apply the law. The presence of Virginia law claims in the suit is not a reason to keep it in Virginia, as federal courts commonly apply laws across jurisdictions, and it would "defy logic to permit defendant's transfer motion to be defeated by [plaintiff's]

---

[25] *See* Keith Flamer, Amazon's HQ2 Search Should be a Reality TV Show, FORBES, Jan. 22, 2018, *https://www.forbes.com/sites/keithflamer/2018/01/22/amazons-hq2-should-be-a-reality-tv-show/#28d48bb733dc*. The Court recognizes there were two choices announced, one in Virginia and one in New York, but Amazon is only going forward with its plans in Virginia.
[26] *See, e.g., Intercarrier Commc'ns, LLC v. Glympse, Inc.*, Civ. No. 3:12-CV-767-JAG, 2013 WL 4083318, at *6 (E.D. Va. Aug. 12, 2013) ("In other words, [the Rocket Docket] should not allow itself to be overrun by a horde of Visigoths who simply want quick results.").

tacking on state [] law claims that essentially mirror" other claims in the case. *See* Dkt. 43 at 19 (quoting *Cognitronics*, 83 F. Supp. 2d at 699).

Maglula defends its deliberate choice of forum. Choosing the "rocket docket," Plaintiff contends, is indeed in the interests of justice. In fact, swift resolution is favored by the courts, Plaintiff continues, citing the aim for a "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. As the average time from filing to final disposition for cases that go to trial is approximately seven months longer in W.D. Wash., Maglula maintains the transfer would be improper. Additionally, Plaintiff calls attention to the Virginia state law claims included in the suit, "suggest[ing] that the overarching dispute might be more efficiently resolved in Virginia." *Wenzel v. Knight*, No. 3:14cv432, 2015 WL 222179, at *4 (E.D. Va. Jan. 14, 2015); *see also Gibbs v. Stinson*, No. 3:18cv676, 2019 U.S. Dist. LEXIS 170198, at *16-17 (E.D. Va. Sep. 30, 2019) (denying transfer where the court had familiarized itself with the factual allegations, legal claims, and defenses included in the case).

Choosing this district, in part, for swift resolution does not warrant transfer here. While "docket considerations 'cannot be the primary reason for retaining a case in this district," it is not an improper consideration *per se*. *Telepharmacy Sols. v. Pickpoint Corp.*, 238 F. Supp. 2d 741, 744 (E.D. Va. 2003). Infringement is an ongoing, time-sensitive issue, and the rationale makes perfect sense to want to resolve the case quickly.[27] There are non-negligible contacts in Virginia to support litigation in this venue, including potential contracts threatened by ongoing

[27] Also related to speed of litigation, Plaintiff drops a footnote to say that potential counterfeit sales to the military may implicate 18 U.S.C. § 2320, and while any criminal prosecution is up to the government, "there is a strong public interest in allowing Maglula to quickly resolve its dispute with Amazon in this District, and not letting it languish in the Western District of Washington." Dkt. 49 at 6 n.8 (emphasis original). However applicable the criminal statute may be, the Court recognizes Maglula's sales to the armed forces and the public interest implicated as a result.

infringement. Thus docket considerations are not "the sole impetus behind the retention of the case." *Id.* The inclusion of Virginia state claims does not materially weigh against transfer.

"The statute provides no guidance as to the weight that should be given to the various factors," and the district courts must determine whether the interests of justice are better served by transfer depending on the circumstances of each case. *Samsung*, 386 F. Supp. 2d at 716. As Maglula notes, "[w]here there is equipoise, the party bearing the burden of proof cannot prevail." *Trs. of Columbia Univ. in the City of N.Y. v. Symantec Corp.*, No. 3:13-CV-808, 2014 U.S. Dist. LEXIS 46172, at *33 (E.D. Va. Apr. 1, 2014). Considering the totality of the circumstances in this action, the Court is not compelled to transfer the case to the Western District of Washington. While Amazon's burden is not as demanding as Maglula might claim, Maglula's choice of forum is due some deference because of some Virginia-specific contacts, Amazon has demonstrated minimal witness inconvenience, both Parties are reasonably able to litigate in this forum, and there is a legitimate interest in swift resolution of Plaintiff's infringement claims. The suit will remain in the Eastern District of Virginia.

**C. Motion to Dismiss Under Rule 12(b)(6)**

First, in the motion to dismiss the complaint in its entirety, Defendants argue the Complaint fails to notify which allegations are directed at which Defendant. Second, if the Court does not dismiss the suit in its entirety on this ground, Defendants argue the induced patent infringement claims must be dismissed for failure to allege facts to support inducement. The Court reviews each in turn.

*1. Notice Pleading*

The federal pleading standards require, per Federal Rule of Civil Procedure Rule 8(a)(2), "a short and plain statement of the claim showing that the pleader is entitled to relief." Modern

jurisprudence on pleading standards has clarified the necessary content of a complaint as it relates to the underlying claim or claims, and whether "there are well-pleaded factual allegations" that, taken as true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Indeed, "[b]oth *Iqbal* and *Twombly*, [] pertain to whether a complaint contains sufficient factual matter to proceed beyond dismissal." *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 417 (4th Cir. 2014) (citing *Iqbal*, 556 U.S. at 678).

Defendants' argument, however, is that Plaintiff fails to meet these standards "[b]ecause the Complaint does not specify which Defendant allegedly committed which wrongs." Dkt. 21 at 5. This does not claim that the factual content of the Complaint is deficient, but rather that the facts fail to properly notify Defendants of individual liability for conduct alleged. Notice is an important part of the pleading standard, as the allegations must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Dkt. 21 at 7 (quoting *Twombly*, 550 U.S. at 555; *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). But again, the sufficiency of the notice arises from the specific factual allegations as they relate to the claim—which Defendants do not directly attack[28]—and not necessarily the assignment of each allegation to each defendant. Further, Defendants point to Plaintiff's reliance on *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342 (4th Cir. 2005), arguing that the "great generality" it allows in pleadings is now inconsistent with the Supreme Court's decisions in *Twombly* and *Iqbal*. This may be, and the Court need not give

[28] The parties discuss the lack of particularity of the claims as they relate to the respective defendants, and Amazon claims a lack of factual support regarding the relationship between the defendant entities. Dkt. 21 at 10. But Defendants do not directly attack the adequacy of the allegations in terms of failure to state a claim until the latter half of the motion as it relates to induced infringement.

it great weight in this instance. But *Chao* continues to be good law in several respects, continues to be cited among district courts in this circuit, and is not generally an improper authority.[29]

Moreover, Amazon does not offer any binding law for the proposition that a complaint naming multiple defendants must specify which defendant is liable for each allegation therein. To be sure, "the indiscriminate character of [] allegations against the 'Defendants'" as a group may be considered adversely in the courts' plausibility analysis under Rule 12(b)(6). *Alliance Tech. Grp., LLC v. Achieve 1, LLC*, Civ. No. 3:12CV701-HEH, 2013 U.S. Dist. LEXIS 4708, at *12-13 (E.D. Va. Jan. 11, 2013). But there is no *per se* prohibition on such pleading. *Id.*

Indeed, when the circumstances so warrant, a lack of particularity can be determinative in a Rule 12(b)(6) challenge. Defendants cite to several such instances. *See Ball v. Takeda Pharms. Am., Inc.*, 963 F. Supp. 2d 497, 503 (E.D. Va. 2013) (dismissing seven of nine defendants, many of which were subsidiary companies with no alleged role in the underlying conduct); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 960 (S.D. Cal. 1996) (finding inadequate notice pleading where, "in a confusingly conclusory manner, [plaintiff] accus[es] each of five defendants of three very different causes of action on two different patents, all in one conclusory sentence, without adequately specifying the grounds for plaintiff's belief that any of these entities have infringed."); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (requiring particularized pleading for each defendant, regardless of corporate relationship, where claims of antitrust conspiracy must defeat allegations of parallel behavior and "plaintiffs conceded that the sole basis for identifying [some] defendants was that they were in the chain of

[29] *See, e.g.*, *Taccino v. Ford Motor Co.*, Civ. No. GLR-18-913, 2019 U.S. Dist. LEXIS 53806, at 19 (D. Md. Mar. 29, 2019) ("To clear the Rule 12(b)(6) hurdle, a complaint must sufficiently allege 'each element of the cause of action so as to inform the opposing party of the claim and its general basis.'") (quoting *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005)).

custody of ownership of Metro.").[30] The instant case is distinguishable, and does not demand dismissal on this ground. Here, there are only two individual defendants—as opposed to nine in *Ball*, ten in *Gen-Probe*, nine in *In re Zinc*, and eight in *iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sep. 20, 2011)—and Plaintiff points to some evidence of individual involvement of each in the alleged infringing sales. Dkt. 39 at 5-6. The allegations are not generally deficient as to the elements of each claim. Further, unlike in *Gen-Probe*, Plaintiff does not allege three types of infringement in one conclusory sentence in the Complaint. To the contrary, each count spans several pages. Considering the spectrum of cases demanding such particularized pleadings, the instant case is not one of them.

*2. Allegations of Inducement of Patent Infringement*

As for the second argument, Defendants say Maglula's induced patent infringement claims are devoid of allegations of intent, and that the two theories of induced infringement in Plaintiff's opposition cannot cure the Complaint. Defendants demand that the "end users" be identified to establish direct infringement, and that the Court disregard attorney argument that seeks to add facts and arguments absent from the Complaint. Amazon also latches on to Maglula's use of the word "conspire," Dkt. 39 at 18, and argues the Complaint fails to set forth facts to plead the legal requirements of conspiracy.

Upon due consideration of the briefing on this issue, the Court disagrees with Defendants. For many of the reasons set forth in Plaintiff's brief, there are adequate allegations of inducement in the Complaint. Direct infringement may be established by circumstantial

[30] Defendants claim that the particularized pleading in *In re Zinc* "applies with equal force [] to infringement allegations," citing back to *Gen-Probe*. Dkt. 21 at 8. The Court disagrees that *Gen-Probe* stands in direct support of that proposition, and is unconvinced that allegations of anti-competitive conduct among and between individual market participants are subject to the same particularity standards as the infringement claims at bar.

evidence, and a plaintiff need not spell out every aspect or interpretation of every allegation to satisfy applicable pleading standards. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) (allowing a reasonable jury to find infringement based on a more likely than not inference); *see also Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely.")).

In sum, Plaintiff has satisfied the pleading standards, both as to particularity and inducement of infringement. Defendants' outstanding questions may be addressed via forthcoming vehicles for discovery.

## IV. CONCLUSION

For the reasons stated herein, the Motion to Compel Arbitration and, as a Result, Dismiss or, in the Alternative, Stay this Action (Dkt. 23) is hereby **DENIED**; the Motion to Transfer Venue to the Western District of Washington Pursuant to 28 U.S.C. § 1404(a) (Dkt. 26) is hereby **DENIED**; and the Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) (Dkt. 20) is hereby **DENIED**.

Defendants shall file an Answer within fourteen days of the entry of this Order.

It is **SO ORDERED**.

April 9, 2020
Alexandria, Virginia

Liam O'Grady
United States District Judge