**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| MAGLULA, LTD.,<br><br>              Plaintiff,<br><br>      v.<br><br>AMAZON.COM, INC. and AMAZON.COM<br>SERVICES, INC.,<br>              Defendants. | Civil Action No. 1:19-cv-01570-LO-IDD |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION<br>FOR RULE 37 SANCTIONS</u>

# **TABLE OF CONTENTS**

**Pages**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND.................................................................................................2

LEGAL STANDARDS ........................................................................................................15

ARGUMENT ........................................................................................................................16

I.      THE COURT SHOULD DENY MAGLULA'S MOTION FOR RULE 37(B)
        SANCTIONS. ...........................................................................................................16

        A.      Amazon Complied With The Court's Order.................................................16

        B.      The Court Should Reject Maglula's Application Of The Four-Part Fourth
                Circuit Test For Determining Sanctions. ...................................................18

                1.      Amazon's Good Faith Efforts Allowed Maglula To Conduct
                        Fulsome Inspections Of Amazon's Fulfillment Centers............................18

                2.      Maglula Has Sustained No Prejudice. ......................................................21

                3.      Maglula Has Not Identified A Valid Need For Deterrence. .....................23

                4.      Less Drastic Sanctions Are Available.......................................................23

II.     THE COURT SHOULD DENY MAGLULA'S REQUEST FOR FEES AND
        EXPENSES ASSOCIATED WITH ITS MOTION TO COMPEL A
        SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2. ................................26

CONCLUSION.....................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**<u>Pages</u>**

**<u>Cases</u>**

*Anderson v. Found. for Advancement, Educ., & Emp. of Am. Indians*,
   155 F.3d 500 (4th Cir. 1998) ............................................................................. 15

*Beach Mart, Inc. v. L&L Wings, Inc.*,
   784 F. App'x 118 (4th Cir. 2019) ...................................................................... 15

*ePlus Inc. v. Lawson Software Inc.*,
   No. 3:09-cv-620, 2012 WL 6562735 (E.D. Va. Dec. 14, 2012) ........................ 19

*In re Outside Wall Litig.*,
   No. 1:09-cv-01217, 2011 WL 5357913 (E.D. Va. Nov. 7, 2011) ..................... 15

*Kemp v. Harris*,
   363 F.R.D. 293 (D. Md. 2009) .......................................................................... 26

*Peterson v. Hantman*,
   227 F.R.D. 13 (D.D.C. 2005) ............................................................................ 26

*Sines v. Kessler*,
   No. 3:17-cv-00072, 2020 WL 2736434 (W.D. Va. May 26, 2020) ................... 25

**<u>Rules</u>**

Fed. R. Civ. P. 37(a)(5)(A) ........................................................................................ 26

Fed. R. Civ. P. 37(b)(2)(A) ........................................................................................ 15

Fed. R. Civ. P. 37(b)(2)(C) ........................................................................................ 15

Fed. R. Civ. P. 37(b)(C) ............................................................................................ 25

**INTRODUCTION**

For a period of two weeks, and during its busiest time of year, Amazon bent over backwards to meet Maglula's endlessly shifting demands to inspect Amazon's fulfillment centers ("FCs") and the accused products in this case:

- Maglula conducted 5 inspections of Amazon's FCs, lasting from approximately 9 hours to 3 days each.  (Dao Decl. ¶ 2; Dorman Decl. ¶ 2)
- Maglula inspected over 4,000 quarantined accused products.  (Derbish Decl. ¶ 4; Dao Decl. ¶ 9; Balsam Decl. ¶ 5; Dorman Decl. ¶ 5; Ex. 1 (Harrison Rpt.) ¶¶ 106-148)
- Maglula took over 3,600 photographs and videos.  (Ex. 1 (Harrison Rpt.) Ex. 2)
- Maglula observed the stowing and picking process of hundreds of accused products for over 24 hours. (Dorman Decl. ¶¶ 12-13)
- Maglula deposed Amazon's corporate witness on the FC picking processes. (Ex. 2 (Dec. 9, 2020 email from P. Dev to B. Tookey).)

After all of that, Maglula yet again claimed to be dissatisfied with its inspections.  Despite having already incurred massive disruption during the peak season in its fulfillment centers, Amazon again attempted to compromise, offering Maglula a modified version of a stipulation it had previously offered to avoid those disruptions.  On December 11, Maglula rejected the offer, announced that the parties were at an impasse, and stated it would file its motion.  (D.I. 212.)  But Maglula did not file its motion until December 31, twenty days after the parties' final meet and confer and the same day Maglula filed two other motions, strategically timed such that Amazon would have to oppose all three motions the same day as it serves its rebuttal expert reports.

But no matter what Amazon did, it would never have been enough for Maglula.  Before Maglula even completed inspections of the FCs, it already decided it would not be satisfied:

> I'm thinking it probably makes sense to continue to discuss the stipulation we started working on as we will need a stipulation regardless of how the inspections turn out.

(Ex. 3 (Dec. 3, 2020 10:39 PM email from J. Berkowitz to J. Desmarais).)

The picture Maglula attempts to paint is simply at odds with what actually happened. Amazon made every effort to comply with the Court's November 20, 2020 order. Despite Maglula's scorched-earth tactics, Amazon repeatedly sought to accommodate Maglula's constantly shifting and unreasonable requests and even offered a stipulation to forego inspections entirely. Maglula's motion is thus nothing more than yet another attempt to plug the gaping holes in its infringement case by seeking unwarranted sanctions. For the reasons discussed herein, Amazon respectfully requests that the Court deny Maglula's motion for Rule 37 sanctions.

## FACTUAL BACKGROUND

Maglula's initial request for an inspection of the Amazon fulfillment centers sought photographs and inspection of the Accused Products. (D.I. 129; Ex. 4 (Maglula's Request for Entry Onto Land No. 1).) Maglula sought an order that would "permit entry onto land by Maglula for inspection of the sequestered Accused Products in Amazon's warehouses or, alternatively, ship the Accused Products in Amazon's possession to an off-site location within this District for inspection by Maglula." (D.I. 129-1.) The proposed order did not contemplate Maglula observing the process of picking the accused products from Amazon's inventory. (*Id.*) Consistent with the proposed order, at the hearing for Maglula's Motion to Compel, Maglula told the Court that Maglula wanted to take photographs of the products:

> So, what we want to do is take pictures of packaging, that's all. The packaging tells it all, and that's all we want to do. We want to go and see these packages in the facilities and take pictures of them, okay.

(Ex. 5 (Nov. 20, 2020 Hr'g Tr.) at 35:13-17.)

### Amazon's Preparations

After the Court granted Maglula's request and issued its November 20, 2020 order (D.I. 163) (the "Order"), Amazon instructed its FCs on how to prepare for the inspections. Because of

Maglula's representations during the November 20th hearing, Amazon understood that Maglula intended to photograph the accused products available at each inspection site.  The accused products would not have been visible to Maglula's representatives when in their bins, which are stacked in tightly packed pods, because the contents of the bins that make up the pods are not readily visible until the pods arrive at picking stations.  (DeLorenzo Decl. ¶ 3.)  Consequently, to comply with the Court's order and permit inspection, FC employees retrieved, or picked, units from the bins in which they were originally stored across multiple floors and bins in the FC.  (*Id.*)  Each FC set out to place those units in a conference room so that they would be ready for Maglula's inspection.  (*Id.*)  To allow sufficient time to prepare for the inspections given the extraordinary capacity constraints at FCs in advance of Black Friday, and to ensure that the products would be ready for Maglula's representatives to inspect, Amazon commenced the picking process on November 24, 2020.  (*Id.*)  The BWI2 FC began picking units on November 24, 2020 and halted picking on November 27, 2020.  (*Id.* ¶ 11.)  The OAK4 FC began picking units at November 25, 2020 and completed picking the last units at 7:59 PM on November 28, 2020.[1]  (*Id.* ¶ 9.)  The LEX1 facility began picking units on November 25, 2020 and completed picking the units at 8:17 AM on November 26, 2020.  (*Id.* ¶ 10.)  The JAX2 FC began picking units on November 25, 2020 and completed picking on November 26, 2020 at 12:46 AM.  (*Id.* ¶ 12.)

**Maglula's Purported "Plan"**

On the eve of the first fulfillment center inspection, Maglula emailed Amazon with a list of additional demands for each inspection, including "a tour of the fulfillment center, including all

---

[1] By the time of the November 27 hearing, the OAK4 FC had picked the vast majority of units. Although Amazon issued a stop instruction immediately after the hearing, it took time for that instruction to filter down to all FC associates across nine FCs on Black Friday.  Consequently, an FC associate picked the remaining 43 units between 5:34 PM and 7:59 PM on November 28. (DeLorenzo Decl. ¶ 9.)

3

equipment and areas of the facilities used for the Accused Products," "[a]n inspection of the process by which all units of Accused Products are picked from the bins and an inspection of those units, on a per ASIN and FCSKU basis," "records of all units of Accused Products, including an identification of the unit's ASIN, FNSKU, and FCSKU and the bin in which it was kept as part of Amazon's virtual quarantine," and "[f]or any Accused Products . . . that are not kept in bins . . . Maglula expect[s] to inspect those separately in their native locations." (Ex. 6 (Nov. 26, 202 12:19 PM email from J. Berkowitz to J. Desmarais) at 1-3.) Maglula included a slew of other demands for FCs that Maglula ultimately did not inspect. (*Id.*) Amazon objected to Maglula's plan. (*Id.* at 1.) Nothing in Maglula's November 26th "plan" stated that Maglula intended to inspect the accused products as they are picked in the ordinary course of business—which would in any case be impossible, given that the inventory at issue was locked out of the systems and processes that Amazon uses in the ordinary course of business; that Maglula sought to observe genuine and counterfeit products sold under the same ASIN being placed in or retrieved from the same bin; or that Maglula intended to capture evidence of representativeness or commingling.

**November 27, 2020 EWR4 Inspection**

At EWR4, Maglula had access to inspect and photograph the approximately 1,000 units at the site. Maglula's inspectors and attorney also toured the facility and took pictures and videos of various areas in the FC. Maglula's representatives observed Amazon's general pick-and-pull operations (i.e., not specific to the accused products), including at the picking-and-pulling stations. Contrary to Maglula's representation (D.I. 213-4), Amazon offered to return a subset of units to inventory so that Maglula could observe the picking process for those units, but ***Maglula*** declined Amazon's offer. (Derbish Decl. ¶ 10.) When Maglula changed its mind and requested that Amazon begin returning the products to inventory, Amazon offered Maglula the opportunity to

observe the stowing process, but Maglula again declined. (*Id.* ¶ 13.)   During the inspection, Maglula's representatives made ad-hoc requests that took hours away from the FC employees' work.   Those requests included conducting a database search of over 520 additional ASINs, which took approximately two hours, to determine if there were additional units of the accused products in the EWR4 inventory.   Unsurprisingly, none were found.   Maglula's representatives then requested a tour of the FC, which Amazon provided, subject to standard safety restrictions. Maglula's representatives had an opportunity to visit several areas of the FC, including the picking and pulling stations, where Amazon employees were in the process of picking products to fulfill customer orders.   The EWR4 inspection lasted approximately 11 hours.   (Derbish Decl.)

**November 27, 2020 Hearing**

During the EWR4 inspection, Maglula notified Amazon that it did not want Amazon to pick the units in advance of the inspection.   As a result, the parties appeared before the Court while the EWR4 inspection was in process.   At the hearing, Maglula complained that units had been picked and insisted that it observe the process of replacing those pre-picked units and watching them be retrieved again:   "They want to handle the problem, but at the same time, we need to see the handling . . . ."   (Ex. 7 (Nov. 27, 2020 Hr'g Tr.) at 8:10-11.)   The Court agreed that Maglula should have the opportunity to watch the units be replaced.   The Court clarified its Order and said that Maglula would be "authorized to watch Amazon personnel take those products back out of the conference room, place them on the shelves where they got them from, and then have Maglula personnel to take pictures of the products on the shelves as was intended by this Court's order. . . . Maglula's personnel can then watch Amazon personnel remove those same products from the shelves, place them back in the conference room for purposes of inspection."   (*Id.* at 7:23-8:6.)

**Amazon's Stop Instructions**

After the November 27, 2020 hearing, Amazon messaged its FCs, instructing them to halt the picking process.  (DeLorenzo Decl. ¶ 4.)  By the time of the November 27, 2020 hearing, unbeknownst to Amazon's counsel, almost all units had been picked.  When the parties discussed the picking status of the FCs on Sunday, November 29th, counsel for Amazon, in good faith, shared with Maglula the picking status of each FC based on data that Amazon's Customer Insights Manager, who is responsible for managing operational escalations in Amazon's FCs, provided.  (DeLorenzo Decl. ¶¶ 4-5; Stempler Decl. ¶ 4.)  As previously explained in later correspondence with Maglula and to the Court, the data on which Amazon's counsel relied was slightly outdated and did not reflect the most recent picking status of the FCs.  (DeLorenzo Decl. ¶¶ 6-7; Stempler Decl. ¶ 5.)  As discussed further below, Maglula proceeded with the remaining three inspections, spending 9 hours at LEX1, 12 hours at BWI2, and over 3 days at JAX2.

**Aftermath of the EWR4 Inspection**

The EWR4 inspection continued after the November 27th hearing.  The EWR4 inspection and Maglula's constantly shifting demands at the site left Amazon with several concerns about the burdens that Maglula was placing on Amazon's FCs and employees during its inspections at Amazon's busiest time of the year.  In addition, Maglula's attorneys stated that, at subsequent inspections, "there may be aspects of the inspections that we need to change in real-time because we believe the changes will also lead to the discovery of additional admissible evidence relevant to the case."  (D.I. 172-2.)  Having dealt with the interruptions to its business at the end of the EWR4 inspection, Amazon sought further guidance from the Court on how the inspections should be conducted.  (D.I. 172.)

Before approaching the Court, the parties attempted to resolve their dispute about how the remaining inspections should occur.  Hearing Maglula's concerns about not being able to observe enough of the picking process at OAK4, Amazon offered Maglula the opportunity to identify five ASINs of its choice at the Dallas FC (DFW7) and the Baltimore FC (BWI2) for which Amazon would stow 10% of the units so that Maglula could observe the retrieval process. (Ex. 8 (L. Stempler Nov. 29, 2020 email to J. Berkowitz) at 3.)  Maglula rejected the proposed compromise. (*Id.* at 2-3.)

### November 30, 2020 Hearing

Amazon sought the Court's assistance on November 30, explaining that the inspections were turning out to be far more burdensome than Maglula had led the Court to believe.  (Ex. 9 (Nov. 30, 2020 Tr.) at 3:19-21, 4:23-5:7, 5:9-6:18.)  During that hearing, Maglula repeatedly referred to its "plan" and insisted that the plan contemplated activities such as Amazon handling the movement of robots to various stations for picking and Maglula representatives making ad-hoc requests.  (*Id.* at 19:11-14, 21:8-16.)  Neither were part of Maglula's "plan."  (Ex. 6 at 1-3.) Amazon reiterated to the Court that it never agreed to the supposed "plan."  (Ex. 9 at 21:1-7.)

██████████████████████████████████████████████████████████

████████████  (*Id.* at 23:7-8, 26:22-27:3, 33:23-34:6.)  The Court ordered the parties to proceed with the inspections, with one in the west, one in the south, one in the east, and one in the Midwest. (*Id.* at 32:12-15, 38:8-11.)  The Court further noted the inspections would be done one at a time, until Maglula found what it sought.  (*Id.* at 42:12-17.)

### December 2, 2020 OAK4 Inspection

At OAK4, Maglula videotaped and photographed 1,674 accused products (Ex. 1 ¶ 107), the processes of selecting products from bins, and various areas of the fulfillment center, such as

the liquidation area and damaged goods area.  Amazon further accommodated Maglula's request to have two representatives observe picking stations.  Amazon also located two units that had not yet been picked and offered Maglula the opportunity to observe the picking of those two units, which Maglula observed and videotaped.  Despite the Court's November 30th instruction that Maglula should not make ad hoc requests of the Amazon employees, Maglula's representatives continued to do so, demanding on-the-spot information about when products were pulled and whether they were pulled in the ordinary course of business.  At Maglula's representative's request, Amazon employees also retrieved the ASIN, FCSKU, and FNSKU information for each of the totes containing the accused products.  At Maglula's request, the Amazon site coordinator escorted the Maglula representatives on a tour of the FC, including the liquidation area and damaged goods area.  The OAK4 inspection lasted approximately 12 hours.  (Magic Decl.)

**December 3, 2020 LEX1 Inspection**

At LEX1, a returns facility, Maglula inspected 177 accused products.  During the inspection, Maglula asked to remove the products from their packaging so they could take pictures.  Although not part of the "plan," and despite Maglula's refusal to permit Amazon to open product packages in Maglula's possession during Amazon's inspections, Amazon permitted Maglula to open the packaging.  Maglula also observed and recorded the picking of two units from their original bins.  The LEX1 inspection lasted approximately 9 hours.  (Dao Decl.)

**December 3, 2020 BWI2 Inspection**

At BWI2, Maglula inspected 736 units.  Maglula sent three attorneys and three investigators to the BWI2 inspection.  Three Amazon fulfillment center employees, including a senior member of the BWI2 FC operations team, spent all, or a significant part of, their day assisting Maglula in conducting the inspection.  Amazon made several picking stations available

for use throughout the day for the Maglula inspection, during which time they were out of service for Amazon's normal operations during the holiday season crush.  Two Maglula representatives observed picking of approximately 250-300 units over a period of approximately six hours.  Although again not part of its "plan," Maglula dictated the order in which the units would be picked, insisting that the units be retrieved by ASIN rather than by floor.  Consequently, each time the Maglula representatives requested to see a pick, the entire team had to move to a new floor and a new picking station.  This required monopolization of a cargo elevator for each floor transition.  In addition, because of the size of the group and social distancing protocols, as the inspection group moved from one picking station on one floor to another, the group displaced an FC worker at a nearby picking station, which was being used to fulfill other customer orders.  Nevertheless, Amazon accommodated Maglula's request until, at about 4 PM, Maglula's representatives changed their plan and asked that the units be picked by floor, which Amazon accommodated.  Towards the end of the inspection, when approximately 30 units remained in inventory, Amazon offered to pick these products using a "forced pick," which was the closest available option to a regular business operation.  Despite now complaining to the Court, Maglula declined the offer and chose to continue picking the remaining 30 units using the manual picking process.  The BWI2 inspection lasted approximately 12 hours.  (Balsam Decl.; DeLorenzo Decl. ¶ 11.)

**December 3, 2020 Meet and Confer**

On the evening of December 3rd, Amazon spoke with Maglula's counsel, who stated, for the first time, that what Maglula *really* sought to observe was not the picking process that had been occurring and that Maglula had been observing thus far, but instead picking of the accused products as it would occur when Amazon fulfills a product for an order placed by a customer.  (Stempler Decl. ¶ 7.)  Amazon explained that this would be impossible:  the accused products are quarantined

units being stored during ongoing litigation.  They are locked out of Amazon's systems and processes used in the ordinary course of business.  They are not available for a customer to order them, and the only way Amazon would be able to create such an order would be to remove the products from quarantine so that they would become sellable, have someone place an order for one of the products, and then wait to retrieve the product at any of the thousands of picking stations at hundreds of FCs across the country.  (*Id.* ¶ 8.)  Amazon explained that there would be no way to reasonably anticipate where the order would be fulfilled—it could happen at any picking station at any FC that had the quarantined accused products.  (*Id.*)

Nevertheless, the BWI2 inspection was ongoing at the time of the call, and several units had not yet been picked.  Amazon immediately investigated whether it could offer a picking process that would appease Maglula.  (*Id.*)  Within thirty minutes, Amazon requested another call with Maglula's attorneys and explained the additional option of a "forced pick"—the closest retrieval Amazon could recreate at the FC to the picking of a product in the ordinary course of fulfilling a customer order.  (*Id.* ¶ 9.)  Amazon offered Maglula the opportunity to observe (1) a forced pick of 30 units at BWI2 that had not yet been picked; (2) a forced pick of Accused Products sold under the main ASIN, B001HBHNHE; (3) the picking process of other, non-accused products in the ordinary course of business (which certainly would demonstrate to Maglula the picking process during ordinary operations); and (4) the stowing and retrieval of units at JAX2, whose inspection was scheduled for the next day.  Maglula rejected every offer, and the parties appeared before the Court again on December 4th.  (*Id.*)

### December 4, 2020 Hearing

At the December 4th hearing, Maglula acknowledged that it had a chance to observe scanning, retrieving, and stowing the Accused Products:

"I worked with counsel for Amazon who was present and then an Amazon employee **to observe when Amazon scans the system, what information – or scans the barcode, what information is available** on Amazon's computer system." (Ex. 10 (Dec. 4, 2020 Hr'g Tr.) at 5:11-14.)

"[W]e decided to have the units transported to a conference room that had been made available from Maglula so **we could inspect the units that had been collected.  That was part of the plan** . . . ." (*Id.* at 6:2-5)

"**[W]e worked with Amazon employees and counsel to get the data, again, that we requested per our plan,** the ASIN, the FNSKU, and the FCSKU for these units for each tote." (*Id.* at 6:16-19.)

"I was informed that two more of our units had been found on the warehouse floor, and that I could observe – they could arrange for a process to be configured such that we could see what we've been referring to as a 'pick' of these units. . . . **[O]ne of Maglula's investigators was able to observe a pick of these two units** along with an Amazon employee and counsel for Amazon.  **We inspected these units.**"  (*Id.* at 6:21-7:4.)

"**We took a brief tour of the warehouse** and concluded our inspection at about 10:45 p.m." (*Id.* at 7:4-5.)

Maglula accomplished all of the above at the OAK4 center alone, after which Maglula went on to inspect *three additional FCs*, including the *3-day* inspection of JAX2.  At the December 4 hearing, however, Maglula claimed to have an unresolved issue:

> Ms. Smith:  . . . [S]o that's where we are on the inspections right now, Your Honor, is that we have not seen a warehouse that they have not gathered at least some or all of the units before we have gotten there.

(*Id.* at 7:13-15.)  But that was not true.  Counsel for Amazon corrected the record, noting that Maglula had already observed units being picked at BWI2:

> The Court:  So, let's start again.  Counsel for Amazon, you just represented that they had an opportunity to observe units that had not been picked.
>
> Ms. Stempler:  That's correct, at BWI, Your Honor, in Maryland.

The Court:  Is that true, counsel for Maglula?

Ms. Smith:  Yes, it is true.  However –

(*Id.* at 8:21-9:2.)  Amazon also notified the Court that it had offered Maglula the opportunity to observe a "forced pick" of 30 units at BWI2 that had not yet been picked, but Maglula had declined that offer.  (*Id.* at 20:15-18.)  By the time of the hearing, the BWI2 inspection had concluded, but the JAX2 inspection was in progress, so Amazon proposed to the Court that it return units to their bins at JAX2 so Maglula could observe the "forced pick" there.  (*Id.* at 20:21-23.)  Maglula agreed.  (*Id.* at 20:25-21:3.)

### JAX2 Inspection

At JAX2, Maglula inspected 1,663 accused products.  Maglula also observed the stowing and picking of over 360 units.  As part of that process, Amazon gathered a team to generate the bin origination data for the picked products.  Amazon provided Maglula a list of bin origination data for each FCSKU so that Maglula could follow along with the stowing process.  During the stowing and picking processes, Amazon accommodated Maglula's request to prioritize certain products for stowing and to dictate the order in which products were stowed back in the facility.  Maglula insisted on stowing products from the first set of priority totes before commencing the picking process, even though Amazon had set up picking-and-pulling stations so that the activities could be done simultaneously.  Amazon then retrieved the accused products that Maglula had observed being stowed.  The process of stowing the prioritized products and then retrieving them one-by-one took approximately 24 hours and covered four floors of the fulfillment center.  As a result, Amazon accommodated an additional two days of inspection beyond what was agreed.  (Dorman Decl.)

12

**Deposition of 30(b)(6) Witness**

Despite the five fulfillment center inspections, Maglula continued to press Amazon for additional information about the picking processes at its fulfillment centers.  To avoid yet another dispute, hopeful that giving Maglula the opportunity to ask any questions that remained after the inspection of five of its fulfillment centers would, once and for all, satisfy Maglula, Amazon agreed to make a witness available.  Amazon made Caroline Ruder available to testify about "(1) differences in in 'force pick' versus a routine pick when a customer order is placed; (2) how a routine pick is conducted (including how the product's ASIN, FNSKU, and FCSKU are used in that process, if at all); and (3) reasons why there would be discrepancies in the number of inventory units in our database versus what is actually present at FCs." (Ex. 2.)  Maglula deposed Ms. Ruder on December 11, 2020.

**Attempted Stipulations and Final Meet-and-Confer**

While the parties were coordinating on the inspections, counsel for Amazon proposed a stipulation to counsel for Maglula.  (Ex. 6 at 13-14.)  The parties proceeded to trade several versions of a stipulation in the interest of obviating Maglula's purported need for the inspections. After the November 27, 2020 hearing, Amazon again proposed a stipulation to Maglula. (Ex. 11 at 3 (Nov. 28, 2020 10:53 AM email from J. Desmarais to J. Berkowitz).)   The parties exchanged variations of the stipulation several times over the next three days, up until the November 30, 2020 hearing.  Maglula sought to include paragraphs that were unrelated to the inspections issue and would require Amazon to concede infringement and trademark counterfeiting.  (Ex. 11 at 2; Ex. 12 (Nov. 27, 2020 5:06 PM email from J. Desmarais to J. Berkowitz).)  Up until 1:19 PM on the afternoon of the November 30, 2020 hearing, Amazon offered Maglula a series of proposals regarding the stipulation and the inspection, but the parties continued to dispute ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████. (Ex. 13 at 2-4

(Nov. 30, 2020 1:19 PM email from J. Desmarais to J. Berkowitz).)  Amazon tried to streamline

the process by proposing that Maglula proceed with the inspection of DFW7, cancel all other

inspections, and ████████████████████████████████████████████████████

█████████████ Maglula rejected this proposal as well.  (Ex. 13 at 1.)

It is clear from the correspondence that before Maglula had completed inspections of

Amazon's FCs, Maglula already decided it would not be satisfied with what it found.   On

December 3, 2020, Maglula's counsel reached out to Amazon's counsel to continue discussion of

a potential stipulation, informing Amazon's counsel that "we will need a stipulation regardless of

how the inspections turn out."  (Ex. 3.)  Amazon's counsel notified Maglula's counsel he was

willing to consider another proposed stipulation.  (Ex. 14 at 3 (Dec. 4, 2020 7:19 AM email from

J. Desmarais to J. Berkowitz).)  Maglula sent a proposed stipulation, again massively overbroad,

on December 8, 2020.  (Ex. 14 at 1.)

On December 9, 2020, the morning after Maglula completed its 3-day inspection of JAX2,

Maglula notified Amazon that it intended to file a motion for sanctions related to the inspections.

(Ex. 15 at 4-5 (Dec. 9, 2020 email from J. Berkowitz to J. Wilcox).)  The parties met and conferred

multiple times throughout the day on December 11, 2020.  In between two of those calls, Amazon

sent Maglula yet another proposed stipulation, working off of the one Maglula had proposed on

December 8.  (Ex. 15 at 1.)  On the final call, Maglula once again rejected Amazon's proposal and

stated that the parties were at an impasse and that Maglula would file its motion.  (D.I. 212.)

Waiting until New Year's Eve—twenty days later and timed such that Amazon's responses would

coincide with its deadline to file responsive expert reports—Maglula filed its motion for Rule 37 sanctions.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 37(b)(2)(A), "[i]f a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders."  As the movant, Maglula bears the burden to establish that sanctions are warranted.  *In re Outside Wall Litig.*, No. 1:09-cv-01217, 2011 WL 5357913, at *2 (E.D. Va. Nov. 7, 2011).  To determine whether Rule 37 sanctions are appropriate, courts in the Fourth Circuit consider "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 124 (4th Cir. 2019) (quoting *Anderson v. Found. for Advancement, Educ., & Emp. of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998)).  Sanctions for not obeying a discovery order include:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination."

Fed. R. Civ. P. 37(b)(2)(A).  This Court need not order the payment of reasonable expenses for a failure to comply with a discovery order if "the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

## ARGUMENT

I.   **THE COURT SHOULD DENY MAGLULA'S MOTION FOR RULE 37(B) SANCTIONS.**

Amazon arranged for Maglula to spend days in its FCs, resulting in Maglula obtaining the discovery it wanted.  But every time Amazon accommodated one of Maglula's requests, Maglula would drum up a new complaint.  Despite Amazon's compliance with the Court's Order and its good-faith efforts to meet Maglula's endlessly shifting demands, Maglula remains determined to shift the blame to Amazon for shortcomings in Maglula's infringement theories.

### A.   Amazon Complied With The Court's Order.

As an initial matter, Rule 37 does not even apply here because there is no failure to comply with a court order.  The Court's Order stated:

> ORDERED that Defendants shall within five days of this Order permit entry onto land by Maglula for inspection of the quarantined Accused Products in Amazon's warehouses, or, alternatively, ship the Accused Products in Amazon's possession to an off-site location within this District for inspection by Maglula.

(D.I. 163.)  After entry of the Order, counsel for Amazon reached out to counsel for Maglula to schedule the inspection.  Maglula notified Amazon of its intent to conduct its first inspection on November 27, 2020 of the EWR4 facility.  That inspection, and the four that followed, proceeded according to the details set forth in the Factual Background section.

It is undisputed that Amazon permitted Maglula entry into its FCs for inspection of the accused products, and Maglula conducted that inspection at all five FCs.  After the Court clarified its Order at the November 27, 2020 hearing, Amazon also permitted Maglula to observe the picking processes at several FCs.  And Amazon devoted several employees, over the course of three days, to stow the picked products and re-pick them while Maglula's attorneys watched and recorded the process.

Maglula does not identify any FC area, product, or process that it did not get an opportunity to observe or record. The thrust of Maglula's motion appears to be that Amazon did not accommodate Maglula's request to observe the picking of the accused products "in the ordinary course of business." First, Maglula's Request for inspection did not include a request to observe a pick in the ordinary course of business, nor did Maglula seek such relief in its motion to compel. Moreover, as Amazon has explained to Maglula (*see, e.g.*, Stempler Decl. ¶ 8), retrieving quarantined products for purposes of a litigation inspection is, by its very nature, not consistent with the ordinary course of fulfilling customer orders of saleable products. To conduct such a pick, Amazon would have to remove the ASIN suppressions for the accused products, reinstate them on the Amazon website, and permit a Maglula representative to place an order for an accused product (all the while hoping that no other customer ordered an accused product, which Maglula no doubt would have contended was infringement), all without the ability to predict where, among the dozens of picking stations at hundreds of FCs, the order for the accused product would ultimately be fulfilled.

Maglula also contends that Amazon purposefully obstructed the inspections to support its own defenses and deprived Maglula of "meaningful discovery that would support its contentions on commingling and representativeness." (D.I. 216 at 15.) But that makes no sense for several reasons. First, as demonstrated in the Factual Background section, Maglula observed the picking process of accused products that had not been picked at OAK4, LEX1, and BWI2. Maglula was even able to dictate the order in which units were picked at BWI2, first directing Amazon's FC employees to pick ASIN-by-ASIN and then directing the FC employees to pick floor-by-floor. (Balsam Decl. ¶¶ 9-11, 15.) Even after all of that, there were still 30 units remaining at the end of the day, for which Amazon offered Maglula the opportunity to observe a "forced pick," which

Maglula declined.  (Stempler Decl.; Balsam Decl. ¶¶ 16-17.)  Maglula also observed the picking process **and** the stowing process at JAX2.  Second, in its motion, Maglula acknowledges that it observed "several genuine Maglula products corresponding to one ASIN returned to a bin with several counterfeit products corresponding to the same ASIN."  (D.I. 216 at 12; *id.* at 12-13.) Maglula contends that its observations support its theory of commingling, debunking its argument that Amazon obstructed its access to such evidence.  (D.I. 216 at 20.)[2]  Maglula thus appears to have obtained the discovery it sought.

> **B.      The Court Should Reject Maglula's Application Of The Four-Part Fourth Circuit Test For Determining Sanctions.**

All four factors that courts in the Fourth Circuit consider when determining sanctions weigh in Amazon's favor and against an award of sanctions.

> **1.      Amazon's Good Faith Efforts Allowed Maglula To Conduct Fulsome Inspections Of Amazon's Fulfillment Centers.**

Amazon made every effort to make the inspections go as seamlessly as possible, working around COVID restrictions and through the holiday shopping rush to give Maglula a fulsome opportunity to observe what it wanted at the FCs.  Even before the 3-day JAX2 inspection, Maglula had already inspected four FCs, photographed and inspected thousands of products, toured two FCs, and observed and recorded the picking processes in at least three FCs.

Nevertheless, Maglula accuses Amazon of bad faith.  To support its argument, Maglula points to Amazon's act of picking the accused products before the inspections.  (D.I. 216 at 18.) But, as explained above, most of the FCs had completed the picking process before the November 27th hearing—and they did so in the interest of helping, not hindering, Maglula.  (DeLorenzo Decl.

---

[2] Maglula defines "commingling" as when "Amazon used interchangeably products with the same ASIN to fulfill customer orders irrespective of the source of the products."  (D.I. 216 at 19 n.6.) Amazon disagrees with this definition.

¶ 3.)  Amazon's actions reveal that it collected the units in good faith, believing that Maglula's aim was to photograph the accused products and endeavoring to make it possible for Maglula to do so in a reasonably efficient manner.  (DeLorenzo Decl. ¶ 3; Ex. 7 at 6:2-4, 6:12-21.)  Amazon's belief was a reasonable interpretation of Maglula's representations at the November 20 hearing.  (Ex. 5 at 35:13-17 ("[W]hat we want to do is take pictures of packaging, that's all.").)  It was also reasonable in light of the requested relief that accompanied Maglula's motion to compel.  Maglula sought an order that Amazon permit Maglula to inspect the products on premises *or*, in the alternative, ship them to Maglula, which obviously would not have provided Maglula the opportunity to observe the picking process.  Amazon's preparation for the inspections, which were based on its good-faith belief that it was making available the products responsive to Maglula's requests, should not be held against it.  *See ePlus Inc. v. Lawson Software Inc.*, No. 3:09-cv-620, 2012 WL 6562735,  at *8 (E.D. Va. Dec. 14, 2012) ("Given the only minor noncompliance with the Court's Order (reflecting mistakes of the sort that is inevitable when undertaking large-scale discovery) . . . the Court cannot conclude that [the defendant] acted in bad faith, that [the plaintiff] was meaningfully prejudiced, or that any non-compliance that was discovered here is the sort that needs to be deterred through sanctions.").[3]

Maglula also claims that the "Trouble Ticketing" document found at the OAK4 facility demonstrates bad faith, implying that Amazon actively instructed its employees to "undermine Maglula's inspection."  (D.I. 216 at 15, 18.)  That allegation is simply not credible.  Amazon never instructed its employees to hinder Maglula's progress in inspecting Amazon's FCs in any way.

---

[3] Moreover, in light of Maglula's and the Court's statements at the November 27, 2020 hearing, Amazon understood that it could only return the units with Maglula's representatives present.  (Ex. 7 at 8:11; *id.* at 7:22-8:6.)  Indeed, when the parties discussed the return of the JAX2 units with the Court, Maglula insisted that it be allowed to observe that process.  (Ex. 10 at 20:21-21:3.)

Instead, as the Trouble Ticketing document plainly reflects, Amazon ███████████████████ ███████████████ to enable Maglula, who had announced its intent to inspect "on a per ASIN and FNSKU basis" (Ex. 6 at 2), to easily access and inspect the accused products.  (DeLorenzo Decl. ¶ 3.)[4]

As further evidence of Amazon's good faith, Amazon allowed Maglula, on multiple occasions, to go far beyond the scope of its original "plan" for inspections and what it told the Court it would do.   For example, despite Maglula's assurances to the Court that Amazon's employees would not be diverted from their work as a result of the inspections, Amazon FC employees responded to Maglula's multiple ad hoc requests to investigate whether additional, non-Maglula products were available to be picked.  (Derbish Decl. ¶¶ 14-16, 19.)  The FC employees also answered Maglula's questions about how picks are conducted.  (Magic Decl. ¶ 7.)  At Maglula's request, Amazon employees correlated bins with product identifiers (e.g., ASIN, FCSKU, and FNSKU) and looked up data in real-time to match products to those identifiers. (Magic Decl. ¶ 4.)  Amazon allowed Maglula to remove the products from their packaging.  (Dao Decl. ¶ 7.)  Amazon even permitted Maglula to dictate the order of the picking process at multiple fulfillment centers.  (Balsam Decl. ¶¶ 9-11, 15; Dorman Decl. ¶ 10)  When compared with the "plan" that Maglula proposed, Maglula went well beyond the scope of what it told Amazon and the Court it wanted to do.   But in the spirit of avoiding further disputes and completing the

---

The "Trouble Ticketing" document is directed to magazine loader products that were sold under ASIN B001HBHNHE at the OAK4 facility.   A "Trouble Ticketing" document/message is Amazon's system of assigning and documenting tasks.   Modifications to Trouble Ticketing documents are generally administrative in nature.   Stop instructions may or may not be reflected in the Trouble Ticketing document. According to the Trouble Ticketing document, nearly all units of ASIN B001HBHNHE had been picked by 4:26 AM GMT on 11/26/2020.  (DeLorenzo Decl. ¶ 13.)

inspections, Amazon endeavored to accommodate Maglula's requests at every turn rather than repeatedly involve the Court.

As a result of Amazon's good-faith efforts, Maglula was able to inspect and photograph well over 4,000 units across five fulfillment centers, observe the stowing and picking of hundreds of units, observe and record ███████████████████████████ █████████████, and tour the FCs themselves—all over 7 days during Amazon's busiest time of year, while Amazon navigated the challenges associated with accommodating the inspections while observing COVID-19 restrictions. This was possible because Amazon took the Court's Order seriously, not because it acted in bad faith. This prong thus weighs against granting sanctions.

### 2.      Maglula Has Sustained No Prejudice.

Maglula asserts that it is prejudiced because Amazon "prevented Maglula from obtaining evidence central to this case regarding both its claims of representativeness and commingling." (D.I. 216 at 19.) This is simply untrue. Maglula got what it wanted, even the opportunity to see and do things at the FCs that were not in Maglula's November 26th "plan." *See* I.B.1. Over the course of five FC inspections, Maglula spent hours and sometimes days photographing and videoing the fulfillment centers and their picking and stowing processes. Amazon offered Maglula additional opportunities to observe the picking of units, including of the main ASIN and using the "forced pick," that Maglula declined. (Derbish Decl. ¶ 10; Balsam Decl. ¶¶ 16-17; Stempler Decl. ¶ 9.) Maglula inspected and photographed well over 4,000 accused products. Maglula observed the picking of hundreds of units. Although Maglula alleges that Amazon interfered with its inspections, Maglula proceeded with every one of them, capturing approximately 3,600 photographs and videos, which Maglula's technical expert, Joshua Harrison, then analyzed in his opening expert report. (Ex. 1 ¶¶ 102-154.) Maglula's expert even concluded, based on his analysis

of the inspections, that the accused products in the FCs are structurally and functionally the same, that they are representative, and that they infringe the patents-in-suit. (*Id.*)

Maglula contends that Amazon "prevented Maglula from engaging in meaningful discovery that would support its contentions on commingling and representativeness." (D.I. 216 at 14.) But even that is false. For example, Maglula told the Court that it wanted to see the accused products being picked so that it could tell whether they are commingled:

> The process involves the robots moving the products on shelves, moving the product to an Amazon employee that then takes the product out of the shelf. That's what we want to see. That's the commingling. That's – that is the commingling. That's how we'll see commingling.

(Ex. 9 at 40:1-5; *see also id.* at 39:13-17.) Maglula recorded that process at multiple FCs and produced those videos to Amazon.[5] Their expert cites those videos in his report. (Ex. 1 ¶¶ 133, 141.) As another example of how Maglula obtained the discovery it set out to get from the inspections, Maglula told Amazon, "To state the obvious: we need to see the products having the same ASIN <u>in the bins</u> because this is apparently what contributes to Amazon's delivery of counterfeits in place of genuine products." (Ex. 6 at 5.) Maglula now claims that it obtained evidence that genuine and allegedly counterfeit products sold under the same ASIN are stored within a single bin. (D.I. 216 at 12-13.)[6] Putting aside Amazon's disagreement with Maglula's interpretation of the discovery it has obtained, Maglula got what it wanted from the inspections

---

[5] Maglula produced the videos at MAGLULA00114296 (video taken at BWI2) and MAGLULA00116856 (video taken at JAX2). Amazon is happy to provide digital copies of the videos at the Court's request.

[66] Amazon does not agree with Maglula's definition of commingling (D.I. 216 at 19 n.6) or that Maglula's observation of genuine Maglula products and allegedly counterfeit products, all sold under the same ASIN and in a single bin, is evidence of commingling or representativeness. But the parties can dispute that point at a later time.

and has shown no prejudice whatsoever.  If Maglula wanted anything further from the inspections and did not get it, it is because it does not exist.  This factor weighs against an award of sanctions.

### 3.     Maglula Has Not Identified A Valid Need For Deterrence.

Maglula contends that the need for deterrence supports awarding sanctions.  (D.I. 216 at 19.)  But the deterrence factor favors Amazon.  Fact discovery has closed, and the inspections have concluded.  There is no risk of Amazon ignoring a pending order regarding FC inspections. Moreover, as demonstrated above, Amazon took the Court's Order seriously.  Amazon spent hours preparing for the inspections and opened its FCs to Maglula for over a week during its busiest period.  Amazon withheld objections when Maglula sought to go beyond the scope of its "plan," such as by allowing Maglula to search its database for additional inventory, dictate the order in which units were stowed and picked, and remove the accused products from their packaging.  *See* I.B.1; Factual Background Section.  Amazon made its FCs available for inspections that lasted anywhere from nine hours to three days, extending the inspections until Maglula got what it wanted, and spent hours of employee time to accommodate Maglula's inspections and field Maglula's real-time requests.  Amazon's continual efforts to meet Maglula's demands demonstrate there is no need for deterrence against non-compliance, whether it be in this case or future litigations.  This factor weighs in favor of denying Maglula's motion.

### 4.     Less Drastic Sanctions Are Available.

For the reasons set forth above, sanctions are not appropriate because Amazon did not fail to comply with the Court's order.  Even if it had so failed, Amazon acted in good faith, without any prejudice to Maglula.  Moreover, there is no need for deterrence because no further inspections are scheduled.  Nevertheless, should the Court entertain Maglula's request, the sanctions Maglula seeks go far beyond what would be necessary.

First, Maglula's request for a rebuttable presumption of commingling and representativeness for all products currently or formerly in Amazon's possession, custody, and control is excessive at least because, in discussing this requested relief, Maglula contends that it already has the evidence it needs to support its position, including in the form of deposition testimony, documents, and evidence gathered at the inspections themselves.  (D.I. 216 at 20.) Maglula's lengthy list of all the documents, testimony, and evidence found at the FCs not only shows the unreasonableness of its requested relief but further demonstrates that Maglula has not sustained any prejudice, as discussed above.  Even its expert attended an inspection, analyzed the inspection findings, and concluded that the products "are structurally and functionally the same" and are representative.  (Ex. 1 ¶¶ 149-152.)  The requested presumption is also overly broad to the extent Maglula intends for it to apply to all products, even those that are not in the FCs.  Maglula suggests such a sanction would deter Amazon from potential non-compliance in future litigation, but for the reasons discussed above, such deterrence is not necessary given Amazon's genuine efforts during the inspections.

Second, Maglula's request that the Court preclude Amazon from asserting a non-infringement defense is nonsensical given that Maglula inspected and photographed thousands of products in all five FCs and its expert relied on those inspections to conclude that the accused products in the FCs infringe.  (Ex. 1 ¶ 153.)  Amazon's compliance with the Court's Order allowed Maglula's expert to draw those conclusions.  Amazon and its technical expert should likewise have the opportunity rebut them and assert a non-infringement defense against all products, including those in the five FCs Maglula inspected.  Maglula suggests this sanction is appropriate because Amazon has accused products in other FCs "that Amazon would jeopardize were it to engage in further noncompliance."  (D.I. 216 at 21.)  It is unclear what Maglula is referencing when it says

24

"further noncompliance" given that fact discovery is closed and inspections have concluded, nor is it evident how or why Maglula thinks Amazon may jeopardize the accused products in its possession.  Regardless, Amazon is preserving the accused products, as it was doing before the inspections, in accordance with the quarantine measures Amazon employs in litigations like this one.

Third, awarding reasonable expenses, including attorneys' fees, associated with the EWR4, OAK4, LEX1, and BWI2 facilities is unwarranted because Amazon's conduct was substantially justified.  Fed. R. Civ. P. 37(b)(C).  Courts in this District find a party's conduct "substantially justified" when "there is a 'genuine dispute' or 'if reasonable people could differ' as to the appropriateness of that party's position or conduct."  *Sines v. Kessler*, No. 3:17-cv-00072, 2020 WL 2736434, at *11 (W.D. Va. May 26, 2020).  Here, the parties dispute whether it is even possible to ███████████████████████████████████████████████s. ███████████ ████████████████████████████████████████ (Ex. 9 at 26:5-6, 28:18-19; Ex. 13 at 11 ("[T]his is more than you will be able to show with the inspections . . . ."); Ex. 13 at 13 (attaching draft stipulation that "gives you more than you would be able to prove from the inspections, and it gives you what you said was the reason behind the inspections").)   Maglula acknowledges this dispute.  (Ex. 9 at 40:14-16.)  As a result, Amazon's decision to move the accused products to a conference room to enable Maglula to easily access and inspect them was substantially justified.  Moreover, reasonable people could find Amazon's conduct to be appropriate in light of Maglula's initial motion to compel inspections and representations at the November 20th hearing.

Simply put, Maglula's proposed sanctions are not only unnecessary but grossly excessive. Should the Court decide to grant Maglula's motion, less drastic sanctions are available.  For example, Maglula admits that it saw "several genuine Maglula products corresponding to one

ASIN returned to a bin with several counterfeit products corresponding to the same ASIN." (D.I.

216 at 12.) A determination that, ███████████████████████████████████

████████████████████████████████████████████████████████████████████

would address Maglula's concerns.

## II.      THE COURT SHOULD DENY MAGLULA'S REQUEST FOR FEES AND EXPENSES ASSOCIATED WITH ITS MOTION TO COMPEL A SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2.

Under Rule 37(a)(5), a court must not order payment of reasonable expenses if "the opposing party's nondisclosure, response, or object was substantially justified or (iii) other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii)-(iii). A party is "substantially justified" under Rule 37(a)(5)(A)(ii) "when there is a 'genuine dispute' or 'if reasonable people could differ' as to the appropriateness of the motion." *Kemp v. Harris*, 363 F.R.D. 293, 296 (D. Md. 2009) (quoting *Peterson v. Hantman*, 227 F.R.D. 13, 16 (D.D.C. 2005)). "'[S]ubstantial justification' could include making meritorious objections to requested discovery, or even engaging in a legitimate dispute over the sequence of discovery.'" *Id.* at 296-97 (citations omitted). Here, the parties have a genuine dispute about whether Maglula had met its burden and provided a substantive infringement position to which Amazon could meaningfully respond.

On November 10, 2020, Maglula complained about Amazon's response to Maglula's Interrogatory No. 2, which seeks the basis for Amazon's non-infringement defense, but Maglula did not specify any alleged deficiencies. (Ex. 16 at 2-3 (Nov. 11, 2020 email from J. Mathew to T. Derbish).) Amazon reminded Maglula that it had served a supplemental response just days before, in accordance with the parties' agreement that Amazon supplement its response after inspecting the nine accused products in Maglula's possession. (*Id.* at 2.) But, in its continued attempt to shift the burden of proof on infringement, Maglula responded, "Amazon's response is deficient because Amazon has not provided any factual basis for its contention that the charted

products are not representative of the uncharted products (for the purposes of infringement)." (*Id.* at 1.)

*Maglula* bears the burden of proof on infringement—and in this case that includes showing that its charted products are representative of all accused products. At the heart of Maglula's complaint about Amazon's response was its contention that it had "already provided Amazon with the factual basis . . . to support its contention that the Accused Products are structurally and operationally the same and infringe the Asserted Patents in substantially the same manner." (*Id.*) But Amazon disagreed. As of that date, Maglula's contentions and interrogatory responses cited claim charts, videos, and photographs, but nowhere analyzed or explained how a product sold under a particular ASIN is structurally and functionally the same as even one other product sold under that ASIN. Maglula's sole factual basis appears to be that "Accused Products sold or offered for sale under a particular ASIN are structurally and operationally the same," citing Amazon's ASIN creation policy and the fact that accused products sold under the same ASIN share an "item_name."

The parties had—and have—a genuine dispute about whether Maglula had shown that the accused products are structurally and functionally the same. Amazon's position was that Maglula did not identify evidence of structural and functional similarity to which Amazon could respond and for which Maglula bears the burden of proof. Amazon therefore declined to supplement a response when there was nothing further to which it could respond. In light of both this genuine dispute and Amazon's meritorious objections, Amazon's position was substantially justified, and sanctions should be denied.[7]

---

[7] Other circumstances make an award here unjust. Maglula did not expend extensive resources in making its motion. The parties met and conferred one time before Maglula filed its motion, and Maglula devoted only 1.5 pages of its brief to the issue. When the parties met and conferred on

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court deny Maglula's

Motion for Rule 37 Sanctions.

Dated:  January 6, 2021   By: */s/ Justin Wilcox*_____
         Justin P.D. Wilcox (#66067)
         John M. Desmarais *(pro hac vice)*
         Laurie Stempler *(pro hac vice)*
         Priyanka R. Dev *(pro hac vice)*
         Thomas Derbish *(pro hac vice)*
         John Dao *(pro hac vice)*
         Eli Balsam *(pro hac vice)*
         DESMARAIS LLP
         230 Park Avenue
         New York, NY 10169
         Telephone: 212-351-3400
         Facsimile: 212-351-3401
         Email: jwilcox@desmaraisllp.com
           jdesmarais@desmaraisllp.com
           lstempler@desmaraisllp.com
           pdev@desmaraisllp.com
           tderbish@desmaraisllp.com
           jdao@desamraisllp.com
           ebalsam@desmaraisllp.com

         *Attorneys for Defendants Amazon.com, Inc.*
         *and Amazon.com Services LLC*

---

the business day following Maglula's November 13th motions, Amazon agreed to supplement its response to Interrogatory 2, doing its best to address the issue of structural and functional similarity notwithstanding the absence of Maglula's factual basis for its position, and served that supplemental response the following week, so Maglula never had to address the issue in reply or prepare to argue it at the hearing.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 6, 2021, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all

counsel of record.

Dated:  January 6, 2021       By:    <u>*/s/ Justin Wilcox*</u>
                                                 Justin P.D. Wilcox (#66067)
                                                 John M. Desmarais (*pro hac vice*)
     Laurie Stempler (*pro hac vice*)
     Priyanka R. Dev (*pro hac vice*)
     Thomas Derbish (*pro hac vice*)
     John Dao (*pro hac vice*)
     Eli Balsam (*pro hac vice*)
     DESMARAIS LLP
     230 Park Avenue
     New York, NY 10169
     Telephone: 212-351-3400
     Facsimile: 212-351-3401
     Email: jwilcox@desmaraisllp.com
             jdesmarais@desmaraisllp.com
             lstempler@desmaraisllp.com
             pdev@desmaraisllp.com
             tderbish@desmaraisllp.com
             jdao@desmaraisllp.com
             ebalsam@desmaraisllp.com

     *Attorneys for Defendants Amazon.com, Inc. and*
     *Amazon.com Services LLC*